Argued April 4, modified May 15, petition for rehearing
denied June 19, 1957

## O'HARRA *v.* PUNDT
### 310 P. 2d 1110

*John O. Sheldahl,* Oregon City, argued the cause for appellant. With him on the brief were John P. Misko and Sheldahl & Misko, of Oregon City.

*Stephen Parker,* Portland, argued the cause for respondent. With him on the brief were James O. Goodwin, and Jack & Beckett, of Oregon City.

Before PERRY, Chief Justice, and ROSSMAN, BRAND and McALLISTER, Justices.

BRAND, J.

The plaintiff O'Harra brought this action in trover against the defendant Pundt on account of the alleged conversion by the defendant of three Malemute dogs. The jury returned a verdict in favor of the plaintiff in the sum of $1,000 compensatory damages and $5,000 punitive damages. The defendant appeals. The sufficiency of the complaint is not challenged. In brief, it alleges that the defendant had temporary custody of the dogs; the plaintiff demanded possession of them, but defendant refused to deliver the dogs to plaintiff, and converted them and disposed of them to his own use. It is alleged that defendant's action was without reasonable cause and in wanton and wilful disregard of the rights of the plaintiff. The defendant filed a general denial and also a separate affirmative answer wherein he alleged that he is a duly licensed veterinarian and that at the time of the alleged conversion he was under a contract with the County Court of Clackamas County. The contract specifies that the purpose of the county court in making the agreement was to provide care, keeping and disposition of all dogs impounded under Chapter 249 Oregon Laws 1949 (now ORS 609.090). The contract provides:

"Now THEREFORE, in consideration of the covenants as hereinafter set forth, second party

agrees to receive, impound and care for, in a sanitary manner, all dogs delivered to the premises hereinafter set forth, by any duly authorized officer under chapter 249 Oregon Laws 1949.

"Second party shall receive the said dogs and immediately place them in a suitable enclosure and feed and water said dogs for a period of not to exceed five days, said time to be computed as hereinafter set forth.

"Second party shall be under no duty to administer any medicines or drugs, or perform any operation on any of said dogs so impounded, and if any of said dogs shall in the opinion of second party be deemed ill or injured to such an extent that it would be inhumane to allow said dog to live, second party shall have the right to dispose of the dog in a humane manner.

"Second party further covenants that if any of said dogs so impounded shall have a metal license tag fastened on its collar, second party will immediately notify the County Clerk of Clackamas County by telephone or postcard as to the number of said license.

"That if any person shall present to second party a release from the County Clerk of Clackamas County showing that he has paid the board and keep for said dog, second party shall immediately release said dog to the person presenting said release without any further charge whatsoever to said person.

"If at the expiration of five days, according to the computation of time as hereinafter set forth, no person presents to second party a release duly signed by the County Clerk of Clackamas County, second party agrees to kill said dog in a humane manner.

"In consideration of the above mentioned covenants of second party, first party agrees to pay to second party the sum of two Dollars and fifty cents for each dog impounded by second party.

"If no person appears within the five days as hereinafter computed, to claim and pay for the keep of any dog so impounded, so that it is necessary for second party to kill said dog, first party agrees to pay further sum of one Dollar and a half for each dog so killed and disposed of.

\* \* \* \* \*

"It is further understood and agreed that in the computation of time for the keep and/or disposition of any dogs the party shall exclude the first day on which the dog is impounded, and shall include the last day, unless said last day falls on Saturday, Sunday or a legal holiday in which event the said fifth day shall be extended to the next weekday.

"Performance is the essence of this agreement and failure on the part of the second party to comply with the provisions herein contained will render this contract null and void.

"This agreement shall expire on December 31, 1956."

The contract was signed by the County Court by its proper officials and by the defendant, and the execution thereof by the County Court was duly authorized by a resolution of the court. The answer of the defendant alleges that on 2 November 1953 a police officer, pursuant to the contract, brought three dogs to the defendant with a request that the defendant impound the same; that the dogs were in an emaciated and sick condition. Defendant alleges on information and belief that the dogs had been picked up by the police officer as dogs considered running at large, as defined by ORS 609.010. Defendant further alleges that he impounded the dogs, that thereafter and on 4 November 1953 the plaintiff appeared to inquire about the dogs, at which time he was informed by defendant that he might have the possession of the dogs upon the pay-

ment of the charges imposed by law. The answer continues as follows:

"* * * said plaintiff informed the defendant that he would not pay said charges but would take the matter up with the West Linn police. That thereafter the condition of said dogs, afflicted as they were with distemper and weakened by their emaciated condition resulting from lack of food and proper care, and agonized by diarrhea and fits, became progressively worse and by November 9th, 1953 one of the younger of said dogs had died and the remaining dogs were in such a sick and emaciated condition, and suffering as aforesaid, that the only remaining and humane thing to do was to put them out of their suffering. That on said date, to-wit, November 9, 1954 [sic], the defendant before taking the action dictated by humane principles, called the West Linn Police Department to inquire as to whether or not the plaintiff had appeared there and had any further discussion with them relating to the dogs he claimed to own. Being advised by the West Linn Police Department that the plaintiff had not appeared there, nor attempted to make any arrangements with the said department with relation to the said dogs, and because the said dogs were in such a condition of weakness and suffering as to preclude their recovery and as to dictate their disposal in a humane manner, the defendant late in the day of said November 9, 1953 did dispose of the two dogs then living in a humane manner and to end their suffering, all in accordance with the terms and provisions of the said contract with the County Court of Clackamas County as aforesaid."

The reply was a general denial.

There are three assignments of error. The first relates to the alleged improper admission of immaterial testimony. The second and third assignments relate to the issue of punitive damages. Before stating the first assignment of error we will review the testimony upon

which that assignment is based. Upon cross examination of the defendant by counsel for the plaintiff, the following questions were asked and answers given:

"Q * * * Well, Doctor, on about November 14th, 1953 you were quoted in the Portland Oregonian as follows, I am quoting from the newspaper, Doctor. 'Subsequently he, Dr. Pundt, said, "The dogs were destroyed because the Clackamas County Court automatically orders dogs put to sleep after five days. I kept these dogs seven days," Dr. Pundt said.' Did you make such a statement to the reporters for the Oregonian, Doctor?

"A  I did not."

Again we quote:

"* * * you deny telling the newspaper reporter you kept these dogs seven days?

"A  I don't remember telling the newspaper reporters anything in that line.

"Q  You remember talking to the newspaper reporters don't you, Doctor?

"A  Yes.

"Q  But you have no memory of telling them you were under orders of the county court to kill the dogs after five days?

"A  Oh, they asked a lot of questions about the county setup. It had nothing to do with this case."

Again we quote:

"Q  Now, in talking with these newspaper reporters, I will ask you if you made any statement to them about the one puppy having died?

"A  I didn't.

"Q  I will ask you if at the same time in talking with the newspaper reporters you made a statement as follows—I will rephrase that. In talking with the newspaper reporters, did you refer to killing all of the dogs?

"A  I don't ever refer to killing anything.

540

"Q  Or disposing of them?

"A  The term is humane destruction.

"Q  All right, did you tell the newspaper reporter there had been a humane destruction of all the dogs?

"A  No.

"Q  You didn't tell them that one dog had died?

"A  I didn't."

The foregoing excerpts from the transcript of testimony constitute all of the evidence which was introduced on cross examination of the defendant Pundt concerning the Oregonian article or the conversation with the reporters relative to it. Upon redirect examination counsel for the defendant asked the following questions and received the following answers:

"Q  Now, Doctor, you were asked concerning certain statements published in the Oregonian, by counsel for the plaintiff. Those statements as published by the Oregonian came to your attention at the time they were published, did they not?

"A  That is right.

"Q  And were those statements as published by the Oregonian true so far as they were related to you?

"A  They were not true.

"Q  And in fact, did you not find it in your judgment best to bring a suit for liable [sic] against the Oregonian for publishing it?

"A  I did."

At this point counsel for plaintiff on recross examination asked the following question:

"Q  Doctor, one question, please. How much are you suing the Oregonian?

An objection was made as follows:

"Mr. Sheldahl: Objected to as immaterial."

The court at first sustained the defendant's objection,

but after argument in chambers the court reconsidered the ruling and permitted the defendant to answer the question. The answer of the defendant was as follows:

"A Fifty thousand dollars punitive damages, fifty thousand dollars exemplary damages and fifteen hundred dollars special damages."

The transcript of testimony fails to disclose what if any other objection or ground of objection was stated by counsel for defendant when the matter was considered in chambers or when the question was answered in open court. The defendant asserts as his first assignment of error that the court erred in failing to sustain the objection to the question "How much are you suing the Oregonian?"

Examination of the testimony set forth supra will disclose that the cross examination of the defendant concerning his conversation with the newspaper men was entirely proper. Counsel for plaintiff was entitled on cross examination to show that defendant had made statements inconsistent with his testimony or to show that the defendant had miscalculated the period of time after which he could kill the dogs. The only occasion on which the cross examiner mentioned a publication in the Oregonian was when he asked the defendant if he made a statement to the reporters. In that cross examination there was nothing to show that the newspaper had libeled the defendant or to suggest that the defendant had sued the paper for libel. It was only on redirect examination by defendant's own counsel that the matter of a suit for libel was mentioned. We are not even informed as to what statements in the paper were deemed by defendant to be libelous. The fact, if it be one, that the newspaper had libeled the defendant was irrelevant, and the fact that defendant had sued for damages on account of such alleged libel

was also irrelevant. When the defendant put in evidence the fact that he had brought the suit, we think he cannot claim prejudicial error when the court permitted the plaintiff to inquire as to the amount for which defendant was suing. It was a suit, not a recovery, which was involved. It may be suggested that the defendant's answer to the question indicated that he, like the plaintiff, was suing for punitive damages and deemed them appropriate, and that this fact may have influenced the jury to award punitive damages against him. This is at best pure speculation. If we are to recognize the jury system as an instrument of justice by "twelve good men and true", we can hardly presume that a jury duly instructed by the court as to the law would award punitive damages against a defendant in an action for conversion because that defendant had sued a third party for punitive damages in a libel suit, the basis of which was undisclosed. Furthermore, the defendant here was not asked if he had sued for punitive damages. He was asked, "How much are you suing the Oregonian?" The defendant volunteered the information that part of his claim was for punitive damages. If we are to speculate as to the effect which the defendant's answer had upon the jurors we might equally well assume that they saw in the action for damages against the Oregonian an evidence of defendant's confidence in the rightness of his position. Assuming that evidence of the libel action was not within the issues of the pending case, the answer to defendant's claim of error would be found in *Patterson et ux. v. Howe,* 102 Or 275, 287, 202 P 225, as follows:

"A ruling made upon a question asked on cross-examination as to a matter which is immaterial because it is not within the issues ought not to be available as grounds for an exception to one who, in the

first instance on his direct examination, offered testimony upon such immaterial matter if the question asked on cross-examination was one which would have been proper, had the matter been material.''

■■ There are other considerations which lead to the conclusion that the court did not err in permitting inquiry on cross examination as to the amount for which the defendant was seeking recovery in the libel action. As we have said, the fact, if it be one, that a newspaper libeled the defendant and was being subjected to suit by reason thereof had no probative value in favor of the defendant in the pending case but it would be quite a different matter to say that the plaintiff could not bring out such facts on cross examination as bearing on defendant's interest or bias in the pending case. It is obvious that the success of defendant's $100,000 action against the newspaper depended largely upon his victory in the action brought against him for conversion. He would make a poor showing as plaintiff suing for injury to his business or reputation if he had already been found guilty of wrongfully killing the dogs. Matters which would otherwise be irrelevant may be brought out on cross examination to show interest or bias or to impair credibility. *Clevenger v. Schallhorn,* 205 Or 209, 286 P2d 651; *Smith v. Pacific Truck Express,* 164 Or 318, 100 P2d 474. We find no merit in the first assignment of error.

■ Defendant next asserts that the court erred in submitting the issue of punitive damages to the jury. Inspection of the contract between the county court and the defendant will disclose that there were two conditions under which the defendant would be authorized to kill dogs which had been impounded. The first was:

"If at the expiration of five days, according to the computation of time as hereinafter set forth,

> no person presents * * * a release * * * second party agrees to kill said dog in a humane manner."

By the undisputed evidence the time had not expired when the dogs were killed, because the fifth day fell on Saturday and, under the contract "the said fifth day shall be extended to the next weekday", which was the Monday on which the dogs were killed. The second condition authorizing the killing of dogs was stated in the contract as follows:

> "* * * if any of said dogs shall in the opinion of second party be deemed ill or injured to such an extent that it would be inhumane to allow said dog to live, second party shall have the right to dispose of the dog in a humane manner."

The court instructed the jury, in effect, that if in defendant's opinion the dogs were ill or injured to such an extent that it would be inhumane to allow them to live, or if they died from natural causes, the defendant would not be liable, but if they were not in his opinion ill or injured to such an extent that it would be inhumane to allow them to live and if they did not die from natural causes, the defendant would be responsible for at least simple damages. The court then gave the instructions on punitive damages which are the basis of defendant's third and last assignment of error. The instructions on that subject are set forth infra. In summarizing the allegations of the complaint the court said:

> "* * * The plaintiff in his complaint also says that the action of the defendant in disposing of the dogs was without reasonable cause and in wanton disregard of plaintiff's rights; * * *."

The court also instructed as follows:

"* * * In addition, the plaintiff is seeking exemplary or punitive damages. Exemplary, punitive or vindictive damages involves the blending of the interest of society in general with those of the aggrieved individual in particular. Such damages are awarded by way of punishment to the offender and as a warning to others, or by way of example.

"In order to recover exemplary damages, there must be actual damage shown. In order to warrant a recovery of exemplary damages, there must be some element of malice, fraud or gross neglect. A guilty intent on the part of the defendant is essential to charge him with exemplary or punitive damages. Where an act has been done in good faith, although it may result in serious injury to the plaintiff, there can be no recovery of exemplary damages. That the defendant acted under a mistaken sense of duty and without evil intent—it is not a case for exemplary damages. The plaintiff has the burden of proof in proving his damages, both actual and punitive, by a preponderance of the evidence the same as any other allegation of his complaint."

The only exception taken to the instruction on punitive damages was that there was no substantial evidence tending to show that defendant acted with malice or in a wilful or wanton manner. By their verdict and under the instructions, the jury must have found that defendant killed all three dogs and that they were not in his opinion ill or injured to such an extent that it would be inhumane to allow them to live, otherwise they could not have returned a verdict for compensatory damages. No motion was ever made by the defendant to take from the jury the case for compensatory damages, and that issue was one for decision by the jury and was recognized as such. In awarding punitive damages under the instruction, they must have found

that defendant did not act in good faith but acted with malice, fraud or gross neglect with a guilty intent or under circumstances of aggravation. The instructions were in harmony with our decisions. *Wilson et ux. v. Kruse,* 199 Or 1, 258 P2d 112; *Green v. Leckington,* 192 Or 601, 236 P2d 335; *Linkhart v. Savely,* 190 Or 484, 227 P2d 187; *Martin v. Cambas,* 134 Or 257, 293 P 601; *Kingsley v. United Rys. Co.,* 66 Or 50, 133 P 785. In fact, the recent cases cited seem to widen the area within which punitive damages may be recovered, using the words "malice or guilty intent  *  *  *  or other circumstances of aggravation."

■ In this case it is peculiarly necessary to bear in mind that the question of the credibility of the parties and witnesses was for the jury to decide. In considering whether the defendant told the truth when he said that he killed two of the dogs because in his opinion they were deemed ill to such an extent that it would have been inhumane to allow them to live, and whether he truthfully stated that one of the dogs had died, the jury were entitled to consider the evidence as to the condition of the dogs. Susie, the mother dog, was a racing dog, having participated in the Anchorage races in February 1953. Her two pups involved in this case were born on the last of July 1953. Plaintiff left Alaska with Susie and the pups on October 5, 1953, less than a month before the dogs were taken to defendant's kennel. Before leaving Anchorage plaintiff had the dogs examined by a veterinarian and secured for them the necessary health certificates so that he could bring them across Canada to the United States. Susie was also given a vaccine for rabies. The dogs passed customs on October 5. After arrival at Oregon City plaintiff tethered the three dogs on the river bank between the river and the highway, in a shady spot which was

well drained. The dogs stayed there for six days and until Monday November 2, when a policeman took them to defendant's pound. During those six days plaintiff went to them every morning, fed and watered them all, and every night again fed the pups and watered them all. The grown dog was fed only once a day, as was customary. During those six days plaintiff fed over 30 pounds of "Friskies" to the three dogs. Plaintiff further testified that when he left the dogs on Monday morning, November 2, they were "all in good health. They ate well and drank their water and were very frisky. * * * The pups were fat. The mother dog was thin, she had, of course, had her litter of pups and the pups had been weaned a short time before. She was thin, but in good health." On that day the police took the dogs.

Officer Knoph testified that on approaching the place where the dogs were chained he heard them whining, but he later testified that it was the pups that were whining, not the mother dog, and the "pups appeared all right." He testified that the mother dog looked pretty sick to him. She had gotten the chain tangled up and had only about six or eight inches of free chain. "The mother dog started vomiting or something—had white stuff on the side of the mouth * * *." But the evidence was that the mother dog had around her neck what is known as a "choke chain" which tightens when the dog pulls. Witness Knoph agreed that when a dog is severely restrained "there will be saliva on the dog's lips and jowls", and he further agreed that the condition in which he found the mother dog could have been the result of her cramped condition. This was on November 2 when police officer Knoph took the dogs to the defendant's pound.

On Wednesday November 4 the plaintiff learned

from a notice in the paper of the possible whereabouts of his dogs. On that day he went to the defendant's place at Jennings Lodge and found the dogs confined in some small cages "about three feet square. * * * If there were runways, they were closed." He swore that the dogs "were happy to see me and jumped around on up on the cages a lot. * * * they were in good health then." Plaintiff told defendant that he would return and get the dogs, but did not set a definite time. Defendant Pundt never mentioned to the plaintiff any sickness whatever, yet the defendant testified that he told plaintiff that the dogs needed attention immediately.

On November 9, the day on which the dogs were killed, Dr. Pundt called Chief of Police Goldade on the phone. Goldade testified that defendant Pundt told him "the time was up on the dogs." This conversation was held in the afternoon of that day. Dr. Pundt said it was "around noon." When the defendant was asked on cross examination, "And at that time you didn't say anything about the five days being up?", he answered, "I don't recall." At another point he denied making the statement. Dr. Pundt said one of the pups died between November 8 and 9. He had mentioned this to none of the witnesses, and brought it out for the first time in his answer to the complaint. On November 4, while the dogs were still alive, the defendant gave Mr. O'Harra a statement showing the amount which would have to be paid to obtain the release of the dogs.

There is a direct conflict in the testimony as to the condition of the two pups on November 2. Both the plaintiff and officer Knoph testified that the two pups were in good condition. Plaintiff said they were fat. The defendant said they were in a "very emaciated

condition.'' Again, there is a direct conflict in the testimony in this: Plaintiff testified that he said he would come back for the dogs, and defendant denied that plaintiff said he would return. The defendant testified that between November 4 and 9 the dogs were ''starving for water'', but the dogs had been in his custody since November 2. The jury were entitled to consider the credibility of the defendant in the light of the fact that he testified that one of the pups died in the night of November 8, yet admitted that he never told the plaintiff of that fact on the 9th. Defendant testified that the other pup had convulsions or fits on the 9th.

Again, defendant Pundt testified that he got in touch with the head of the dog control board, Mr. White (since deceased). He said, ''Mr. White and I decided to put them humanely to death.'' Plaintiff O'Harra was with Mr. White for an hour-and-a-half on the same day and Mr. White made no statement to him with reference to Dr. Pundt's having called him.

Defendant admitted that he did not tell the plaintiff that the dogs had to be reclaimed or released within five days or they would be disposed of. Defendant testified that one of the dogs had fits, but he did not put them in his isolation ward. The defendant stated that his understanding of the contract with the county contained no provision making it mandatory for him to kill the dogs ''under any circumstances.'' We agree that there was no obligation imposed upon the defendant to kill the dogs in question here.

Chief of Police Goldade testified that the defendant told him the plaintiff lived in a hotel in Oregon City. Defendant denied that he had so informed the officer. Goldade recollected that defendant told him, ''the time

was up on the dogs'', but had no recollection that the defendant said a word about the dogs being sick.

■ The defendant contends that the court erred in submitting the issue of punitive damages to the jury. We have summarized the evidence on which the plaintiff relies in support of his claim for punitive damages, and while a close question is presented, we have come to the conclusion that the court erred in submitting that question to the jury. In view of the instructions given to the jury on the issue of compensatory damages, it is clear that the jury by its verdict found that the defendant did not at the time of the killing have the opinion that the dogs were ill or injured to such an extent that it would be inhumane to allow them to live. But the jury may well have found that the defendant erroneously believed that the ''time was up'' when he killed the dogs and that thereafter when he discovered his error he sought to justify his action by falsely claiming that the dogs were ill and that he was authorized for that reason to kill them. The fact, if it be one, that defendant lied as to the condition of the dogs in an effort to escape the results of his mistake in counting time would not show that *at the time of the killing* he acted in wanton or wilful disregard of the rights of the plaintiff, as alleged in the complaint. We have concluded that the evidence is consistent with the theory that he killed the dogs as a result of a careless mistake in computing the time, and thereafter sought to excuse himself by claiming that the condition of the dogs was such as to authorize their destruction under the contract.

■ There is no evidence whatever of any actual malice or ill will on the part of the defendant toward the plaintiff. The question of the defendant's state of mind, whether wanton and wilful or not, relates to the

time when he did the act of killing. An innocent or negligent act could not be converted into a wanton and wilful one by the fact that defendant thereafter sought by improper means to justify his mistake. It follows that the state of mind of the defendant at the time of the act became a matter of pure speculation, and the evidence was insufficient to support a verdict for punitive damages.

We are well aware that few subjects except fluoridation and taxes are so fully packed with human emotion as are controversies over "man's best friend", the dog. It is not difficult for us to understand the feelings of the jury as they considered the evidence in this case, but it is our duty in the cold light of the morning after to consider whether there was substantial evidence warranting the imposition of what amounts to a $5,000 fine in this case.

The judgment for $1,000 compensatory damages is affirmed. The judgment for punitive damages is reversed.