Argued and submitted June 18, affirmed September 22,
appellants' reconsideration and respondent's reconsideration
denied November 6, petitions for review
denied December 9, 1980 (290 Or 211)

JOACHIM,
*Respondent - Cross-Appellant,*
*v.*
CRATER LAKE LODGE, INC., et al,
*Appellants - Cross-Respondents.*

(No. 420-787, CA 12971)

617 P2d 632

Henry C. Willener, Portland, argued the cause for appellants - cross-respondents. With him on the briefs were Souther, Spaulding, Kinsey, Williamson & Schwabe, Wayne A. Williamson, Ridgway K. Foley, Jr., Katherine H. O'Neil, and Elizabeth K. Reeve, Portland.

Don S. Willner, Portland, argued the cause for respondent - cross-appellant. With him on the briefs were Willner, Bennett, Bobbitt & Hartman, Kafoury & Hagen and Charles S. Tauman, Portland.

Before Richardson, Presiding Judge, and Warden and Warren, Judges.

WARDEN, J.

## WARDEN, J.

After a trial by jury in Multnomah County, plaintiff recovered a judgment for $4000 compensatory damages and $15,000 punitive damages from defendants for illness caused by drinking contaminated water at Crater Lake National Park in the summer of 1975. Defendants appeal only the award of punitive damages. Their seven assignments of error raise four contentions: (1) punitive damages cannot be awarded on the allegations contained in the complaint; (2) the trial court improperly instructed the jury on the standard to be applied in awarding punitive damages; (3) evidence of events occurring after plaintiff left the lodge was improperly admitted; and (4) there was insufficient evidence to support the award of punitive damages. On cross-appeal, plaintiff assigns as error (1) denial of plaintiff's motion for class action certification; (2) admission of evidence of the fact and amount of plaintiff's prior settlement with the United States; and (3) the trial court's withdrawal of count two of plaintiff's complaint based on strict products liability. We affirm in all respects.

In 1975, defendant Peyton was president and manager of defendant Crater Lake Lodge, Inc., which operated a concession at Crater Lake National Park consisting of a lodge with dining room, a separate cafeteria and a gas station. The park itself was under the jurisdiction of the United States Department of Interior. The lodge opened for the 1975 season on June 13, and by June 20 some employees began to experience gastrointestinal problems of diarrhea, nausea, cramps and vomiting. Such illness, recurring at the start of each season, had earned the sobriquet "Crater Lake Crud," which some attributed to changes in altitude, climate and food for those stricken. This year the symptoms were more severe and persistent. By June 30, nearly three-quarters of the lodge employees were sick. During the outbreak of illness, a number of state and federal agencies became involved in trying to pinpoint the source of the problem, including the Klamath County Health Service, the United States

Environmental Protection Agency, the Oregon State Health Office, the Oregon Office of Disease Control and the Center for Disease Control in Atlanta, Georgia. The chlorine level in the water supply was tested repeatedly and considered adequate. Food or water contamination and communicable disease were suspected as possible causes, but the authorities were baffled. The source of the illness was not discovered until July 10, when a maintenance man discovered sewage overflowing from a manhole in the watershed. The sewage contained a virulent strain of the E. coli microorganism, which had not been eliminated by chlorination of the water.

Plaintiff visited Crater Lake National Park on July 7, 1975. She drank water at the gas station in the park and stayed overnight in Klamath Falls. Returning to the park the next day, she drank more water from a fountain along the rim of the lake, not under the control of defendants, but within the National Park, and ate dinner at the lodge dining room, where she drank a quantity of water. On July 9, she experienced the onset of the illness which is the subject of this action.

In the Third Amended Complaint plaintiff alleged the following in support of the claim for punitive damages:

"Plaintiff became ill as a proximate result of the willful, wanton and malicious misconduct of the defendants as hereinafter set forth in one or more of the following particulars:

"1. Defendants knew that the agent of the illness was located in the food or water, but the defendants wantonly, maliciously and willfully did not give the plaintiff adequate warning of the source of the illness, and interfered with the attempts by others to give warning of the source of the illness;

"2. Defendants knew that one or more of their employees had contracted a disease in a communicable form, but defendants wantonly, maliciously and willfully permitted, encouraged or required such employees to continue working;

"3. Defendants knew that the agent of the illness was located in the food or water, but the defendants wantonly, willfully and maliciously interfered with attempts by others to locate and identify the source of the illness;

"4. Defendants knew that an epidemic of gastrointestinal illness was occurring among their employees, but wantonly, maliciously and willfully failed to take reasonable precautions during the epidemic of illness in that defendants did not warn plaintiff of the existence of the epidemic and continued to operate their business and supplied food and water to the plaintiff."

Defendants argue that because the underlying cause of action was based on ordinary negligence, punitive damages cannot be sustained.[1]

Defendants point to the following passage in the Supreme Court's decision in *Chamberlain v. Jim Fisher Motors, Inc.,* 282 Or 229, 237, 578 P2d 1225 (1978):

"In *Harrell v. Travelers Indemnity Co.,* 279 Or 199, 208-212, 567 P2d 1013 (1977), decided after the trial of this case, this court discussed some of the problems resulting from the extension of liability for punitive damages to cases in which there was no wanton misconduct or intentional infliction of injury, but in which defendant's conduct was grossly negligent or reckless. *For those reasons, as stated in Harrell, we hold that gross negligence or recklessness is not, in and of itself, sufficient to support an award of punitive damages.*

---

[1] Defendants raised this issue in a roundabout way at trial. In plaintiff's second amended complaint, the allegations of wanton misconduct were set apart in a separate cause of action. Defendants demurred on the ground that the allegations did not constitute a separate cause of action. The trial court overruled the demurrer, but plaintiff, conceding that the allegations could not stand alone, tendered a third amended complaint which appended the allegations of wanton misconduct to the first cause of action in negligence. The trial court accepted that change. Defendants did not move to strike the allegations from the third amended complaint, although they attempted to demur orally on the same grounds as previously, by means of an oral stipulation from opposing counsel that a written demurrer would not be necessary. During the somewhat confused discussion between the judge and various counsel, defendants' counsel argued that the deliberate disregard of others' rights and negligence were logically incompatible.

> "It follows, in our opinion, that it was not proper to instruct the jury in this case that 'wanton misconduct,' includes not only a 'deliberate disregard' of the rights of others, but also a 'reckless indifference to such rights.' This case, however, was tried prior to our decision in *Harrell* and we do not consider this case to be an appropriate one in which to attempt to otherwise limit or redefine the nature of the misconduct which will properly support an award of punitive damages, as that rule was stated in *Noe v. Kaiser Foundation Hosp., supra,* [248 Or 420, 425, 435 P2d 306 (1967)]." (Emphasis added)

*Chamberlain* concerned the alleged misrepresentation by the seller of a used automobile that it had in its possession the requisite assigned certificate of title from the prior owner. The passage set forth above appears to be by way of dicta, for the court reversed the award of punitive damages on purely evidentiary grounds. Defendants argue that if gross negligence cannot support an award of punitive damages, then ordinary negligence certainly may not.

In *Harrell v. Travelers Indemnity Co., supra,* referred to in the above passage, the only issue decided was whether liability for punitive damages was insurable. The award of punitive damages in that case had already been affirmed by the Supreme Court in its previous decision in *Harrell v. Ames,* 265 Or 183, 191, 508 P2d 211 (1973). In that case, where plaintiff sought compensatory and punitive damages for personal injuries sustained when plaintiff's car was hit head-on by a drunken driver, the court reaffirmed the following principles expressed in *Dorn v. Wilmarth,* 254 Or 236, 239-241, 458 P2d 942 (1969):

> "This court has long approved the award of punitive damages in appropriate cases to punish the defendant and to thus deter him and all others from like conduct.* * * [Citations omitted]
> "* * * * *
> "Although this court has used a variety of terms to describe conduct justifying punitive damages it has consistently held that such damages are proper to deter wanton misconduct. In *Day v. Holland, supra,* [15 Or 464, 15 P 855 (1887)], the court said:

" '* * *[W]here a tort is committed with a bad motive, or so recklessly as to imply a disregard of social obligations, and generally when the defendant appears to have done the act wantonly, maliciously, or wickedly, the jury may, in their discretion, give exemplary damages.* * *' 15 Or at 469.

"The above statement has been quoted in several later cases and in many other cases conduct warranting punitive damages has been described as wanton. * * *

"* * * * *

"Wantonness has been generally equated with recklessness,* * *."

The court in *Chamberlain,* in proposing a distinction between wanton misconduct and gross negligence, implied that wanton misconduct may properly be characterized as "the deliberate disregard of the rights of others." *Chamberlain v. Jim Fisher Motors, Inc., supra,* 282 Or at 237-38. The same formulation was employed in *Harrell v. Ames, supra,* 265 Or at 192, 508 P2d at 218. *See also, McElwain v. Georgia-Pacific,* 245 Or 247, 249, 421 P2d 957 (1966), where the court stated that "[t]he intentional disregard of the interest of another is the equivalent of legal malice, and justifies punitive damages for trespass." Other phrases have been used as well. Wanton misconduct is also described in *Chamberlain* as conduct that is "sufficiently arbitrary and unconscionable to constitute a grievous violation of societal interests." *Supra,* 282 Or at 238. The most recent pronouncement from the Supreme Court on the issue of punitive damages occurs in the fraud case of *Milliken v. Green,* 283 Or 283, 286, 583 P2d 548 (1978), reiterating the formula from medical malpractice cases that punitive damages are allowable where the violation of societal norms is "of an aggravated nature and of the kind that sanctions would tend to prevent."

In one such case, *Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 425, 435 P2d 306 (1967), the court analyzed the problem as the relationship between the conduct and the duty owed by the offending party:

"It is only in those instances where the violation of societal interests is sufficiently great and of a kind that sanctions would tend to prevent, that the use of punitive damages is proper. Regardless of the nomenclature by which a violation of these obligations is described (grossly negligent, willful, wanton, malicious, etc.), it is apparent that this court has decided that it is proper to use the sanction of punitive damages where there has been a particularly aggravated disregard by a member of the medical profession of his professional duties (preservation of life and health). There would appear to be no rational justification for any separate rule or language applicable to the medical profession. *It is proper, however, in determining whether there has been a sufficiently aggravated violation of societal interests to justify the sanctions of punitive damages as a preventative measure, that any duty owed by the offending party be taken into consideration. This is so whether the offending person be a physician, lawyer, electrician, or any other person who may owe a duty by virtue of his relationship to the offended party." (Emphasis added)*

Finally, we succinctly stated in *Senn v. Bunick,* 40 Or App 33, 41, 594 P2d 837 (1979):

"At the heart of all the punitive damages cases is the idea that in some instances deliberate or careless conduct is so much in disregard of the rights of another that it should lay the actor open to monetary punishment that would tend to deter that sort of conduct in the future. *See* Hodel, *The Doctrine of Exemplary Damages in Oregon,* 44 Or L Rev 175, 183-86 (1965). The term 'smart money' is ancient and apt."

■ Rather than depend solely on verbal formulations culled from other cases with different factual contexts to determine what conduct may support an award of punitive damages,[2] we look to the factual allegations of plaintiff's complaint here. In addition to repeating allegations of negligence by defendants with the addition of the words "wanton, wilful and malicious," plaintiff alleges that defendants "interfered with the attempts by others to give warning of the

---

[2] *See Hodel, Exemplary Damages in Oregon,* 44 OLR 175, 215 (1965).

source of the illness." If proven, that allegation would sustain a finding of wanton misconduct, exhibiting not merely the failure to warn of a risk of illness, but active efforts on the part of the owner of a public accommodation to conceal news of an outbreak of disease at his establishment. That describes a "sufficiently aggravated violation of societal interests" to justify the award of punitive damages. *Noe v. Kaiser Foundation Hosp., supra.* The allegations of the complaint are sufficient to sustain an award of punitive damages.

■■ Defendants attack the trial court's instructions to the jury as erroneously equating negligence with wanton misconduct. That, however, was not the import of the instructions given.[3] The trial judge used

---

[3] The trial court instructed the jury in relevant part:

"Now, to give you kind of a spectrum of something, you have to look at whether wanton misconduct is above negligence. It's worse than negligence, but it is less than intentionally hurting somebody. It is a wanton disregard for the rights of others. I will give you some definitions of that.

"If you intentionally want to premeditate and shoot somebody, that is an intentional act that is willful. If you have a negligence that is a failure to exercise ordinary care, you've got a wanton misconduct that is in the middle and that is not a reckless disregard of the rights of others but an intentional disregard to the rights of others as I will define for you,* * *.

"* * * * *

"All right. Now I used an expression I want to give you an exact definition of as to wanton misconduct, and I will do that now since I have already defined negligence. And wanton misconduct is conduct amounting to a deliberate disregard of the rights of others. It is a deliberate disregard of the rights of others.

"* * * * *

"All right. Then on the final instruction in respect to punitive damages, if you found that the Plaintiff is entitled to general damages, you will then consider whether to award punitive damages. Punitive damages are awarded to the Plaintiff in addition to general damage in order to discourage the Defendants and others from engaging in wanton misconduct, and, as I told you, wanton misconduct is conduct amounting to deliberate disregard of the rights of others, and in considering punitive damages, you must first determine whether the Defendants were guilty of wanton misconduct. And if you decide this

the standard jury instruction on punitive damages approved by the Supreme Court in *Fleet v. May Dept. Stores, Inc.,* 262 Or 592, 604, 500 P2d 1054 (1972), with the important modification that reference to "reckless indifference" to the rights of others has been deleted, as suggested in *Chamberlain.* The instructions make it evident that the jury had to find more than negligence, that is, wanton misconduct, in order to assess punitive damages. While the instructions could have employed a number of different phrases to describe wanton misconduct, as discussed above, the definition given, "deliberate disregard of the rights of others," was approved in *Harrell v. Ames, supra,* 265 Or at 192.

Defendants contend that events that occurred after plaintiff left the lodge on July 8 were irrelevant to this plaintiff's allegations of wanton misconduct. The trial court admitted evidence of such events to show the state of mind of defendant Peyton with respect to the alleged wanton motive. The most damaging event after plaintiff departed was that on the night of July 10, Peyton tore down several posted notices that the water was not fit to drink.

*Vandermeer v. Pacific N.W. Develop.,* 274 Or 221, 231, 545 P2d 868 (1976), was an action for compensatory and punitive damages for false arrest arising out of an incident in which defendant landlord made a citizen's arrest of plaintiff and two others, and threatened them with eviction, for their failure to leave the apartment recreation room following a demand to do so. After noting that evidence of later conduct is not generally probative of earlier, the court

issue against the Defendants, you may award punitive damages, but you are not required to, this is a discretionary call on behalf of the jury since punitive damages are discretionary.

"If you decide to award punitive damages, you may properly consider the following items in fixing the amount: the character of the Defendants' conduct, the Defendants motive, the amount of damages which would be required to discourage the Defendants and others from engaging in such conduct in the future, and the income and assets of the Defendants.

"The amount of punitive damages may not exceed the sum of $100,000."

ruled admissible evidence not only that defendant had later actually tried to evict plaintiff as being probative of malice and hence material to the issue of punitive damages, but also that defendant had later tried to evict the two others. The court explained:

"This evidence also tends to prove defendant's representative's state of mind at the time the arrests were made. All three were threatened at the same time and their arrests were virtually simultaneous. The evidence is less probative of defendant's attitude toward plaintiff because the action was not taken against plaintiff but against third persons. Nevertheless, we believe the evidence is sufficiently probative of the mental attitude of defendant's representative toward all who stayed in the recreation room at the time the threats were made to bring its admissibility within the permissible discretion of the trial judge." *Supra,* 274 Or at 231.

Here, it would not be enough for plaintiff to adduce evidence of malice only after she had left the park to support her claim for punitive damages. Viewed in the light most favorable to plaintiff, there must be some evidence of "deliberate disregard" while she was present, for defendant's mental state could easily have changed over the course of the disease outbreak at Crater Lake Lodge. There was such evidence here. A lodge employee who worked at the information desk testified that in a meeting in August, 1975, defendant Peyton admitted he had directed one of his supervising staff to have all newspapers containing articles about the epidemic removed from the lodge. The witness, who had had an independent source of newspapers, testified that the first article about the outbreak appeared in the Klamath Falls Herald and News on July 8, 1975, and she recalled that was the date removal was first effected. Plaintiff introduced a copy of the July 8 newspaper containing an article headlined "Outbreak at Crater Lake" with the subtitle "Nausea, Cramps, Vomiting." The story quoted an investigating epidemiologist as saying that possible causes of the outbreak included consumption of tainted food and water, and person-to-person contact. Again, plaintiff dined at the lodge and drank

several glasses of the water on July 8; she became ill on July 9.

The evidence of defendant Peyton's later misconduct in taking down the notices of contaminated water is relevant to corroborate Peyton's state of mind at the time he engaged in similar earlier misconduct in causing newspaper accounts of the outbreak to be removed from the lodge lobby. Both actions were directed generally toward his patrons. The trial court's ruling on the admissibility of the later evidence was within the permissible range of its discretion. *Vandermeer v. Pacific N.W. Develop., supra,* 274 Or at 231.

■ What we have said here also disposes of defendants' final contention. We hold that the evidence that defendant Peyton interfered with the access of lodge patrons to newspaper stories of the outbreak of illness at the lodge, coupled with later evidence that he took down notices of water contamination, is sufficient to establish the wanton misconduct alleged in the complaint.

On cross-appeal, plaintiff contends it was error to deny her motion for class action certification. ORS 13.220(2)(c)[4] imposes two requirements for

---

[4] ORS 13.220(2)(c) provides:

"(c) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Common questions of law or fact shall not be deemed to predominate over questions affecting only individual members if the court finds it likely that final determination of the action will require separate adjudications relate primarily to the calculation of damages. The matters pertinent to the findings include:

"(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;

"(B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

"(C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum;

"(D) The difficulties likely to be encountered in the management of a class action, including the feasibility of giving adequate notice;

maintenance of a class action: common questions must predominate, and the class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." Plaintiff relies on a federal case where a class action was certified for personal injury claims resulting from allegedly contaminated water aboard a cruise ship. *Hernandez v. Motor Vessel Skyward,* 61 FRD 558, 561 (D.Fla. 1973). In *Hernandez,* however, the issue of causation was not included in the certification:

> "In the instant case, only one issue is available for class treatment. Whether the defendants were negligent in preparing either the drinking water or food that was available for consumption by the passengers is subject to a uniform determination. A ruling on this issue would be applicable to any prospective claimant. The issues of the proximate cause of each passenger's illness, contract liability, the adequacy of medical treatment afforded each passenger, and damages are individual in nature. The likelihood of individual defenses on these issues is at least recognizable. For example, the symptoms manifested by some of the passengers may be related to seasickness or some other illness unrelated to exposure to contaminated food or water."

In *Newman v. Tualatin Develop. Co., Inc.,* 287 Or 47, 53-54, 597 P2d 800 (1979), the Supreme Court allowed maintenance of a class action by purchasers of townhouses for damages resulting from installation of the wrong type of pipes by the seller, on the theories of implied warranty and negligence. The court affirmed denial of certification on the alternate theory of express warranty, since the issue of reliance upon the express warranty would have to be individually determined:

"(E) The likelihood the damages to be recovered by individual class members if judgment for the class is entered are so minimal as not to warrant the intervention of the court;

"(F) After a preliminary hearing or otherwise, the determination by the court that the probability of sustaining the claim or defense is minimal."

"In *Bernard v. First Nat'l Bank,* 275 Or 145, 550 P2d 1203 (1976), we held that a class action was not maintainable because individual determinations would have to be made of what knowledge the borrowers had of the bank's method of computing interest. Likewise, in the present case it would appear that individual determinations of reliance would be required. The result would be that common questions of fact would not predominate over questions affecting individual members of the class. ORS 13.220(2)(c).

"* * * * *

"We hold that reliance upon the express warranty is not proved merely by evidence that the warranty was contained in a sales brochure given to all class members. Inasmuch as reliance in this case would have to be individually determined, the trial court was correct in ruling a class action could not be brought upon the theory of express warranty."

Here, the question whether potential plaintiffs had drunk water at the concession or eaten food prepared by defendants would have to be individually determined. The trial court analyzed the problem as follows:

"The Court finds that such common questions do not predominate over questions affecting individual members. Clearly this type of action requires 'separate adjudications of the claims of numerous members of the class' on issues beyond that of damages. Defendants, in their Memorandum In Opposition To Maintenance Of A Class Action point out by affidavit that a park patron could have consumed contaminated water not under the defendants' control. Thus, of the possible 1,500 members it must be determined (a) whether they came upon park premises at the defendants' invitation, (b) whether they drank water provided by the defendants, (c) whether the water caused the gastrointestinal illness, (d) what illness was suffered, (e) what caused the illness, (f) what injuries resulted, and finally, what damages flowed from the injury. All these issues constitute very difficult and arduous individual proof that is disfavored by ORS 13.220(2)(c)(D). This type of litigation would be most difficult to manage in class action form. Further, due to the possible variance

in injuries, interests and settlement possibilities, the 'fair and efficient' adjudication of the controversies would dictate these plaintiffs bring these separate actions individually."

The determination whether a class action is a superior method of adjudication is a matter in which the trial court has wide latitude, since this is "largely a decision of judicial administration; that is, how the trial shall proceed." *Newman v. Tualatin Development Co., Inc., supra,* 287 Or at 51. We conclude that the trial court did not err in denying class action certification.

Plaintiff states in her brief on cross-appeal that the remaining assigned errors concerning the prior settlement and withdrawal of the products liability count require correction if a class is certified and another trial held. Since we affirm the denial of class action certification and the case is not being remanded, it is unncessary to discuss those assignments of error.

Affirmed.