SCHMIDT et ux,
*Respondents,*
*v.*
PINE TREE LAND
DEVELOPMENT CO. et al,
*Appellants.*

(No. 77-189 L, CA 15704)

619 P2d 673

Rex E. H. Armstrong, Portland, argued the cause for appellants. With him on the briefs was Lindsay, Hart, Neil & Weigler, Portland.

Mike Ratliff, Klamath Falls, argued the cause for respondents. With him on the brief was Parks & Ratliff, Klamath Falls.

Before Joseph, Presiding Judge, and Warden and Warren, Judges.

WARREN, J.

**WARREN, J.**

In this action for fraud in the sale of real property, the jury awarded plaintiffs general damages of $25,000 and punitive damages of $250,000. Defendants did not move for a directed verdict on their liability for the underlying tort and appeal only from that portion of the judgment awarding punitive damages. Error is assigned to (1) the failure of the trial court to remove the issue of punitive damages from the jury's consideration; and (2) the admission of financial information concerning defendants' parent corporations. We need only discuss the first assignment. In so doing we view the evidence in the light most favorable to plaintiffs, the prevailing parties below.

Between 1965 and 1978, defendants were engaged in selling residential lots in six subdivisions in the Klamath Falls area containing in excess of 10,000 individual lots. Initially, the sales were made to the general public by approximately 100 sales persons spread over at least two states, all of whom were apparently authorized to sell any available lot. In 1965 and 1966 defendants' sales records were maintained by hand. In 1967, the sales records were transferred to a computer system. Under the computer system, purchasers of more than one lot were listed in the computer under the lowest numbered lot only.

In 1965, defendants entered into a land sales contract with John L. Renneberg to sell two lots numbered 34 and 35, in a development in Klamath County known as Klamath Falls Forest Estates. In May, 1970, after a default by Renneberg, the contracts were canceled, and the property was listed with an independent broker. In August, 1970, Renneberg brought his account current and his contracts were reinstated, apparently without notice to the broker. In March, 1971, at a time when Renneberg's contracts had again been canceled after a further default in payments, the broker submitted and defendants accepted contracts for the sale of both lots. Lot 34 was sold to a third party; lot 35 was sold to plaintiffs. In April, 1971, Renneberg's contracts were again reinstated, but the interim sales went unnoticed. In May, 1971, a check of the computer records revealed the double sale of lot 34 to Renneberg and to the third party. The second purchaser of lot

34 was notified and his purchase price refunded. Renneberg retained his interest in lot 34.

Because Renneberg's two accounts were listed in the computer with reference only to lot 34, the lowest numbered of the two lots, the computer check did not (and apparently could not) disclose the double sale of lot 35. From 1971 to 1975, both Renneberg and plaintiffs paid on the respective contracts. The tax statements were sent to plaintiffs. In 1974, a computer search to locate double sales again failed to turn up the sale of lot 35 to both Renneberg and plaintiffs, although six unrelated double sales were discovered.[1] In August, 1975, Renneberg paid off his contract for lot 35, and obtained a warranty deed, which he recorded in October, 1975. Plaintiffs thereafter became aware of Renneberg's ownership interest when, not having received their 1976 tax statement, they made inquiries of the county clerk.

The evidence as to how the double sale of lot 35 to Renneberg and plaintiffs occurred is not disputed. Plaintiffs contend that circumstances surrounding other double sales made both before and after the sale to plaintiffs provide the evidentiary basis to support the jury's award of punitive damages. There were five other subdivisions handled by the marketing company which also handled defendants' development. In 1965 or 1966, one double sale was investigated by the district attorney of Klamath County, who testified at this trial that although he was unable to prove the double sale was intentional, he believed the evidence showed that defendants were "very very careless or negligent in the way that they were handling it." He recalled there were two other such incidents.

Another witness, a former tract manager for defendants employed during several months in 1966, testified that on one occasion concerning a double sale in another subdivision, he was instructed not to let the buyers, who had come up from California, see the twice-sold lot but to try to switch them to another lot. He testified that

---

[1] The record does not provide us with any information as to whether any of the six double sales which were discovered during the 1974 computer check involved purchases of multiple lots whose accounts, like Renneberg's, would have been programmed into the computer under the lowest numbered lot only.

four or five similar incidents happened during his employment. Throughout the six subdivisions, there were up to ten double sales which occurred in 1965-66, when accounts were maintained by hand records. There were up to nine double sales which occurred from 1967 to 1978, during the defective computer phase. During the two phases, approximately 10,000 lots were sold.

Plaintiffs' complaint alleged in relevant part:

"That at the time of contracting defendants Pine Tree Land Development Co., and Tree Lake Development Co. represented that upon payment in full of the purchase price they would convey clear title to said real property to the plaintiffs.

"That plaintiffs relied upon defendants' representations and proceeded to make all required payments to defendants at the rate of $21.00 per month.

"That defendants' representations were false and were made by defendants, through their agents, with reckless disregard for their truth or falsity in that defendants had conveyed Lot 35, Block 33, Klamath Falls Forest Estates, Highway 66 Unit, Plat No. 2, in Klamath County, Oregon, to one John Renneberg. That defendants intended that plaintiffs rely on their representations, and that by accepting plaintiffs' monthly payments, at all times reiterated their misrepresentations."

Since the defendants did not contend at trial that the evidence did not support a finding of fraud, the jury's finding on that question is not reviewable. For the purposes of appeal then, defendants' representation was not only false "but * * * was made with knowledge that it was false or was made recklessly without any knowledge of its truth, i.e., the necessary element of scienter, among other required elements of fraud." *Huszar v. Certified Realty Co.,* 278 Or 29, 32, 562 P2d 1184 (1977). We are not precluded, however, from examining the evidence to determine whether defendants' conduct, whether it was fraud or not, was of a sufficiently aggravated nature as to justify the imposition of punitive damages as a deterrent. *Chamberlain v. Jim Fisher Motors, Inc.,* 282 Or 229, 238, 578 P2d 1225 (1978).

In *Chamberlain* the defendant was held strictly liable to the buyer for failure to possess an assigned certificate of title at the time of the sale of an automobile under

ORS 481.310(2) and 481.315(3). The Supreme Court held that it was error to instruct a jury that punitive damages may be predicated on conduct which is merely grossly negligent or reckless. The court explicitly acknowledged, however, that it was not "otherwise" limiting or redefining the nature of the misconduct which will properly support an award of punitive damages, as the rule was stated in *Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 425, 435 P2d 306 (1967). In *Noe* punitive damages were held not warranted for an unauthorized circumcision of a child by a doctor, despite evidence that defendant had available information that the parents had not authorized it. The test for award of punitive damages as stated in *Noe* was that the conduct of the defendant must constitute "a sufficiently aggravated violation of societal interests to justify the sanctions of punitive damages as a preventative measure." The evidence of negligence or inadvertence was held insufficiently aggravated to sustain the award of punitive damages.

In *Sumrell v. Household Finance,* 250 Or 381, 384, 443 P2d 179 (1968), the Supreme Court held that punitive damages, which the trial court awarded to the buyer of an automobile for conversion of the vehicle by a judgment creditor of the seller, would not be sustained because defendants' actions in repossessing it were "not entirely unreasonable," in view of erroneous information on ownership it had received from the Department of Motor Vehicles. In *Baumbach v. Poole,* 266 Or 154, 159-60, 511 P2d 1219 (1973), an award of punitive damages against a developer of land who had exceeded the bounds of an easement in making a road through plaintiff's land, was reversed by the Supreme Court because the evidence showed that defendant had endeavored to avoid encroachment, and any tresspass was inadvertent. As we said in discussing *Baumbach* in *Senn v. Bunick,* 40 Or App 33, 42, 594 P2d 837 (1979):

"Obviously, awarding punitive damages against a defendant who took pains to avoid encroachment, and who honestly and reasonably believed he was not encroaching, would not promote societal interests by deterring others in the future."

Here, defendants' actions were not entirely unreasonable. Renneberg's contract for lot 35 had been canceled at the time the property was listed for sale in 1970. It had not been reinstated at the time plaintiffs' land sale contract for lot 35 was accepted by defendants in 1971. Although the reinstatement of Renneberg's contract in April, 1971, was improper, due to the nature of the computer program the error was not discovered in either 1971 or 1974, when defendants were actively attempting to uncover double sales. While defendants' record-keeping system may certainly be characterized as faulty, there is nothing in the record to show that the double sale in this case was the result of anything other than clerical error. Poor record retrieval capability due to the manner in which defendants' computer was programmed prevented the earlier discovery of the error, but that does not constitute in our opinion a grievous violation of societal interests warranting the sanctions of punitive damages.

Plaintiffs rely most heavily on evidence of the conduct of defendants in attempting to conceal from other purchasers that double sales of their lots had been made by attempting to convince them to accept other lots. They also point to defendants' lackadaisical handling of problems created by other double sales occurring in 1965 and 1966, when the record-keeping system was maintained by hand. Even drawing from that evidence the benefit of all inferences in favor of plaintiffs, *see Landauer v. Steelman,* 275 Or 135, 142, 549 P2d 1256 (1976), it does not establish that those double sales occurred other than through negligence. Defendants' attempts to conceal from other purchasers the fact that double sales had taken place amounts to evidence of "an attempt to avoid responsibility for past actions rather than evidence of previous disregard for consequences." *Noe v. Kaiser Foundation Hosp.,* 248 Or *supra* at 426-27. As stated in *O'Harra v. Pundt,* 210 Or 533, 310 P2d 1110 (1957), "[t]he question of the defendant's state of mind, whether wanton and wilful or not, relates to the time when he did the act * * *. An innocent or negligent act could not be converted into a wanton and wilful one by the fact that defendant thereafter sought by improper means to justify his mistake." 210 Or at 550-51. Moreover the only evidence of defendants' evasive conduct with regard to

other sales was not shown to be related to the relevant period of time and none was shown to have been exhibited toward these plaintiffs. *Cf. Joachim v. Crater Lake Lodge, Inc.,* 48 Or App 379, 389, 617 P2d 632 (1980)(evidence of active efforts of owner of lodge to conceal news of health hazard during plaintiff's stay).

We conclude that the evidence taken at its strongest shows no more than negligent business practices and was not sufficient to establish that defendants' conduct constituted the kind of aggravated violation of societal interests necessary to justify the sanction of punitive damages as a preventative measure.

The judgment of the trial court is modified to delete that portion of the judgment awarding plaintiffs punitive damages.