Argued and submitted in Portland April 6,
affirmed August 4, 1981

## SCHMIDT et ux,
### *Petitioners,*
.*v.*
## PINE TREE LAND DEVELOPMENT CO. et al,
### *Respondents.*

(TC 77-189 L, CA 15704, SC 27505)

631 P2d 1373

Mike Ratliff, of Parks & Ratliff, Klamath Falls, argued the cause and filed a brief for petitioners.

Rex E. H. Armstrong, of Lindsay, Hart, Neil & Weigler, Portland, argued the cause and filed briefs for respondents.

LINDE, J.

## LINDE, J.

The narrow issue in this case is whether the Court of Appeals erred in setting aside an award of punitive damages in an action for reckless misrepresentation in the sale of real property, when defendant had moved to have the issue of punitive damages taken from the jury's consideration but failed to move for a directed verdict on the underlying tort. The Court of Appeals permitted defendants to pursue their assignment of error as to the motion they did make, and it concluded that the evidence, viewed most favorably for plaintiff, "shows no more than negligent business practices and was not sufficient" to support punitive damages. 49 Or App 323, 619 P2d 673 (1980). We allowed review to examine whether defendants' challenge to the evidentiary basis of the award of punitive damages was precluded because a corresponding challenge to the judgment as a whole was precluded by defendants' failure to move for a directed verdict. We affirm the decision of the Court of Appeals.

Plaintiffs pleaded and tried a cause of action for deceit, predicated on allegations that defendants sold them a plot of land and represented that upon payment of the purchase price defendants could convey clear title, but that "defendants' representations were false and made. . . with reckless disregard for their truth or falsity," in that defendants had previously sold the same land to someone else. Defendants claimed that the double sale resulted from a clerical error after the original buyer first defaulted but later was permitted to reinstate his contract. They moved to withdraw plaintiffs' claim for punitive damages from the jury but did not move to direct a verdict against plaintiffs' claim for general damages. The trial court submitted both claims to the jury, which returned a verdict for $25,000 in general damages and $250,000 in punitive damages.

■ A long line of decisions dating from 1895 holds that a party which has not moved for a directed verdict cannot assert on appeal that the evidence does not support a jury verdict. *See R.J. Frank Realty, Inc. v. Heuvel,* 284 Or 301, 311, 586 P2d 1123 (1978), *Shmit v. Day,* 27 Or 110, 116-17, 39 P 870 (1895). The rule is addressed to the logic of appellate practice, not to the merits of the appellant's

assertion. A litigant who has not asked the trial court to rule that there is insufficient evidence to place an issue before the jury cannot show that the court committed error. Since reversal in an action at law must be based on an error, ORS 19.125(2),[1] failure to present the issue to the trial court can prevent a reversal, as defendants recognized in briefing this appeal.

■    It does not necessarily follow, however, that the decision so placed beyond appeal was correct on the merits and is beyond examination in the context of other issues that were properly preserved for appeal. In another procedural sequence, this effect can follow from the doctrines of res judicata or the law of the case. Here the motion to withdraw the question of punitive damages was made before the case was submitted to the jury, so that the trial court's responsibility to allow or deny that motion was not foreclosed by the jury's subsequent verdict. We conclude that the Court of Appeals did not err in examining defendants' first assignment of error.

■    We also affirm the court's conclusion in making that examination. As stated above, plaintiff's theory of fraud was that defendants were "reckless" in disregarding the possibility that their salesmen might sell a lot already sold, not that defendants deliberately tried to profit by selling the same lot to two buyers. The function of punitive damages to penalize harmful acts done with a bad motive may ordinarily justify liability for such damages in cases of intentional fraud, *see Green v. Uncle Don's Mobile City,* 279 Or 425, 432, 568 P2d 1375 (1977), *Lewis v. Worldwide Imports, Inc.,* 238 Or 580, 582, 395 P2d 922 (1964), but this court has not held that punitive damages may always be recovered for recklessly false representations. *See Chamberlain v. Jim Fisher Motors, Inc.,* 282 Or 229, 238, 578 P2d 1225 (1978).

---

[1] ORS 19.125(2):

"(2) No judgment shall be reversed or modified except for error substantially affecting the rights of a party."

This court, by contrast, has set aside an award of punitive damages in equity despite the appellant's failure to object in the trial court. *Hay v. Stevens,* 271 Or 16, 22, 530 P2d 37 (1975).

In the wide range of situations said to justify punitive damages, the present case is not one of giving vent to personal and societal outrage at aggressive or malicious wrongdoing, *see, e.g., Roshak v. Leathers,* 277 Or 207, 560 P2d 275 (1977) (assault and battery), *Linkhart v. Savely,* 190 Or 484, 227 P2d 187 (1951) (same), *Gumm v. Heider,* 220 Or 5, 34, 348 P2d 455 (1963) (malicious prosecution). The large scale of these corporate defendants' land development and marketing project places the case rather with those in which punitive damages serve the function to deter enterprises from accepting the risks of harming other private or public interests by recklessly substandard methods of operation at the cost of paying economic compensation to those who come forward to claim it. *See, e.g., McElwain v. Georgia-Pacific Corp.,* 245 Or 247, 421 P2d 957 (1966) (air pollution); *cf. Reynolds Metals Co. v. Lampert,* 316 F2d 272, *aff'd on reh'g* 324 F2d 465 (9th Cir 1963), 372 F2d 245 (9th Cir 1967) (same). Such operations may well be wholly impersonal with respect to any victim, indeed conducted with the hope that no harm will occur, and they may not involve a culpable attitude on the part of any one person responsible for the management of the enterprise; yet this court has held that such lack of managerial culpability alone does not foreclose punitive damages. *See Stroud v. Denny's Restaurant, Inc.,* 271 Or 430, 532 P2d 790 (1975), contrary to dicta in *Sullivan v. Oregon Ry. & Nav. Co.,* 12 Or 392, 7 P 508 (1885). Still, to justify punitive damages the conduct must go beyond mere carelessness to a willful or reckless disregard of risk of harm to others of a magnitude evincing a high degree of social irresponsibility. In such a setting the plaintiff whose economic loss may be insignificant to the enterprise and perhaps too small to justify the expenses of pressing a claim represents social interests larger than his own. *See generally* Mallor and Roberts, *Punitive Damages: Toward a Principled Approach,* 31 Hast L J 639, 649, 652 (1980).

Therefore we pass by defendants' suggestion that punitive damages for misrepresentation should be limited to intentional fraud and turn to the factual merits of the present case. On that issue, we approve and adopt the decision of the Court of Appeals. For convenience, we set out relevant parts of the court's opinion here:

"Between 1965 and 1978, defendants were engaged in selling residential lots in six subdivisions in the Klamath Falls area containing in excess of 10,000 individual lots. Initially, the sales were made to the general public by approximately 100 sales persons spread over at least two states, all of whom were apparently authorized to sell any available lot. In 1965 and 1966 defendants' sales records were maintained by hand. In 1967, the sales records were transferred to a computer system. Under the computer system, purchasers of more than one lot were listed in the computer under the lowest numbered lot only.

"In 1965, defendants entered into a land sales contract with John L. Renneberg to sell two lots numbered 34 and 35, in a development in Klamath County known as Klamath Falls Forest Estates. In May, 1970, after a default by Renneberg, the contracts were canceled, and the property was listed with an independent broker. In August, 1970, Renneberg brought his account current and his contracts were reinstated, apparently without notice to the broker. In March, 1971, at a time when Renneberg's contracts had again been canceled after a further default in payments, the broker submitted and defendants accepted contracts for the sale of both lots. Lot 34 was sold to a third party; lot 35 was sold to plaintiffs. In April, 1971, Renneberg's contracts were again reinstated, but the interim sales went unnoticed. In May, 1971, a check of the computer records revealed the double sale of lot 34 to Renneberg and to the third party. The second purchaser of lot 34 was notified and his purchase price refunded. Renneberg retained his interest in lot 34.

"Because Renneberg's two accounts were listed in the computer with reference only to lot 34, the lowest numbered of the two lots, the computer check did not (and apparently could not) disclose the double sale of lot 35. From 1971 to 1975, both Renneberg and plaintiffs paid on the respective contracts. The tax statements were sent to plaintiffs. In 1974, a computer search to locate double sales again failed to turn up the sale of lot 35 to both Renneberg and plaintiffs, although six unrelated double sales were discovered. (Footnote omitted). In August, 1975, Renneberg paid off his contract for lot 35, and obtained a warranty deed, which he recorded in October, 1975. Plaintiffs thereafter became aware of Renneberg's ownership interest when, not having received their 1976 tax statement, they made inquiries of the county clerk.

"The evidence as to how the double sale of lot 35 to Renneberg and plaintiffs occurred is not disputed. Plaintiffs contend that circumstances surrounding other double sales made both before and after the sale to plaintiffs provide the evidentiary basis to support the jury's award of punitive damages. There were five other subdivisions handled by the marketing company which also handled defendants' development. In 1965 or 1966, one double sale was investigated by the district attorney of Klamath County, who testified at this trial that although he was unable to prove the double sale was intentional, he believed the evidence showed that defendants were 'very very careless or negligent in the way that they were handling it.' He recalled there were two other such incidents.

"Another witness, a former tract manager for defendants employed during several months in 1966, testified that on one occasion concerning a double sale in another subdivision, he was instructed not to let the buyers, who had come up from California, see the twice-sold lot but to try to switch them to another lot. He testified that four or five similar incidents happened during his employment. Throughout the six subdivisions, there were up to ten double sales which occurred in 1965-66, when accounts were maintained by hand records. There were up to nine double sales which occurred from 1967 to 1978, during the defective computer phase. During the two phases, approximately 10,000 lots were sold. . . . "

49 Or App 325-327. After a review of precedents, the opinion continued:

"Here, defendants' actions were not entirely unreasonable. Renneberg's contract for lot 35 had been canceled at the time the property was listed for sale in 1970. It had not been reinstated at the time plaintiffs' land sale contract for lot 35 was accepted by the defendants in 1971. Although the reinstatement of Renneberg's contract in April, 1971, was improper, due to the nature of the computer program the error was not discovered in either 1971 or 1974, when defendants were actively attempting to uncover double sales. While defendants' record-keeping system may certainly be characterized as faulty, there is nothing in the record to show that the double sale in this case was the result of anything other than clerical error. Poor record retrieval capability due to the manner in which the defendants' computer was programmed prevented the earlier discovery of the error, but that does not tute in our

opinion a grievous violation of societal interests warranting the sanctions of punitive damages."[2]

\* \* \* \* \*

"We conclude that the evidence taken at its strongest shows no more than negligent business practices and was not sufficient to establish that defendants' conduct constituted the kind of aggravated violation of societal interests necessary to justify the sanction of punitive damages as a preventative measure."

49 Or App 329-330.

The court's conclusion made it unnecessary for it, or for this court, to reach defendants' second assignment of error.

Affirmed.

---

[2] The opinion then stated that evidence of attempts to conceal the improper double sales from purchasers did not show that these double sales themselves had resulted from a wanton or willful attitude, citing *Noe v. Kaiser Foundation Hosp.,* 248 Or 420, 426-427, 435 P2d 306 (1967) and *O'Harra v. Pundt,* 210 Or 533, 310 P2d 1110 (1957).