379 So.2d 412 (1980)
FEE, PARKER & LLOYD, P.A. and Otis R. Parker, Jr., Appellants,
v.
John B. SULLIVAN, M.D. and James I. Terry et al., Appellees.
No. 77-1499.
District Court of Appeal of Florida, Fourth District.
January 30, 1980.
*414 Larry Klein and Adams, Sullivan, Coogler, Watson & Smith, and Stephen C. McAliley of Brennan, McAliley, Albury & Hayskar, West Palm Beach, for appellants.
Ellis S. Rubin, Miami, for appellee, John B. Sullivan, M.D.
MOORE, Judge.
This is an appeal and cross-appeal from a final judgment entered after a jury verdict in a malicious prosecution action. The action was brought by John Sullivan, a medical doctor, against his former patient, James Terry, and the patient's lawyers, the firm of Fee, Parker and Lloyd, P.A., and Otis Parker, individually. Dr. Sullivan alleged that Terry and Parker had maliciously prosecuted a medical malpractice action against him for his treatment of Terry. That medical malpractice action was voluntarily dismissed prior to trial. The essence of Dr. Sullivan's complaint here was that Terry and Parker did not have probable cause to sue him for medical malpractice.
The jury returned a verdict in favor of Sullivan in the amount of $175,000 against Parker and his law firm and found Terry not liable. After the trial court ordered a remittitur in the amount of $100,000, final judgment was entered for Sullivan for $75,000 plus costs against Parker and his firm. They appeal and Sullivan cross-appeals.
Appellants contend the proof was insufficient to establish the elements of a malicious prosecution action. They argue that Sullivan was required to prove that appellants lacked probable cause for commencing the malpractice action and failed to do so. Agreeing with this contention, we reverse and find it unnecessary to address Sullivan's cross-appeal.
The Florida Constitution provides:
§ 21 Access to Courts  The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay.
Art. I, § 21, Fla. Const.
Our concept of justice and the system which we have created for its administration necessarily dictates a public policy which encourages the settlement of private disputes through access to the courts. Such access, however, is not without limitation. When the court is used to promote an unjustifiable cause, an injustice is perpetrated upon one's adversary whose only recourse is, again, in court through the tort of malicious prosecution. Thus, one who maliciously sues another without probable cause is subjected to answering for his own wrong.
A lawyer must represent his client zealously within the bounds of the law and professional ethics. As an advocate he must accept the facts as he finds them and render his advise consistent with those facts and his knowledge of the law. He is therefore charged with making a reasonable investigation in determining the facts before initiating a suit on his client's behalf. If he then has a reasonable, honest belief that his client has a tenable claim, he enjoys the same freedom of access to the court as does his client. Any more stringent standard would effectively stifle the peaceful resolution of disputes and deny the very justice the courts are intended to administer.
It is well settled in Florida that an action for malicious prosecution lies where there is a concurrence of the following elements: (1) the commencement or continuation of an original civil or criminal judicial *415 proceeding; (2) its legal causation by the present defendant against the plaintiff; (3) its bona fide termination in favor of the plaintiff; (4) the absence of probable cause for such prosecution; (5) the presence of malice; and (6) damages conforming to legal standards resulting to the plaintiff. Duval Jewelry Co. v. Smith, 102 Fla. 717, 136 So. 878 (1931); Tatum Brothers Real Estate and Investment Co. v. Watson, 92 Fla. 278, 109 So. 623 (1926); Burchell v. Bechert, 356 So.2d 377 (Fla. 4th DCA 1978).
With these principles in mind, we turn now to the facts available to appellants at the time suit was filed against Dr. Sullivan in the malpractice action.
Mr. Terry suffered a Monteggia fracture of the forearm, consisting of a fracture of the ulna and a dislocation of the head of the radius. Terry went to Dr. Sullivan, an orthopedic surgeon, who performed a closed reduction (the manipulation of the bones back into place) and placed a cast on the arm on June 23, 1970. Although X-rays were taken of the arm immediately after this procedure, no subsequent X-rays were taken until August 13, at which time Dr. Sullivan discovered that the closed reduction was unsuccessful. He then performed an open reduction on August 17 and surgically inserted an intramedullary rod into the bone to stabilize the fracture. The patient's wrist was not involved and Dr. Sullivan did not intend to insert the pin into the wrist. The pin insertion was performed without the use of an X-ray machine. X-rays are normally taken prior to closing the incision to insure that the rod does not extend too far. X-rays were taken the day after the surgery and Dr. Sullivan discovered the rod was 1 1/2 inches too long and extended into the wrist. Despite this discovery, nothing was done for about six weeks. Thereafter, Dr. Sullivan performed a second operation to shorten the rod. After this procedure, and with his arm still in pain and with no apparent healing of the fracture, Terry went to Dr. Stalker, another orthopedic surgeon. After initially consulting with this doctor and being advised that further treatment was necessary, Mr. Terry consulted with Mr. Fee, an associate of Mr. Parker, for advice regarding his will and his medical treatment by Dr. Sullivan.
During this conference, Terry reiterated the above sequence of events and produced the X-rays and other pertinent records. Although he did not express an interest at that time in bringing a malpractice action against Dr. Sullivan, he did indicate he wanted to recover for the expenses incurred as a result of the hospitalizations and surgical procedures. Fee relayed this information to Parker who examined the X-rays which showed the rod extending into the wrist area, and reviewed the hospital records which indicated that no X-rays of Terry's arm had been taken until the day after the open reduction.
After consulting with his attorney, Mr. Terry returned to Dr. Stalker, who performed a third surgical procedure resulting in a successful bone graft. It was after this surgery that Parker consulted with Dr. Stalker regarding Sullivan's prior treatment of Terry. The statements made at this conference are in conflict. Stalker denied at trial that he expressly told Parker that Sullivan's treatment fell below the standard of care for the community; however, as a result of the conference and all other evidence, Parker was clearly of that opinion. When asked if Dr. Stalker told him Dr. Sullivan had done something wrong, Parker responded, "I'm sure he did." Mr. Fee, a witness to the conference, testified that when Parker told Stalker that Terry felt the treatment he received from Sullivan was below standard, Stalker replied, "I tend to agree."
In his trial testimony, Dr. Stalker admitted he told Parker it was unusual for a rod to protrude into the wrist area, although he did not specifically mention the word "malpractice". He also admitted he informed Parker that a physician should X-ray the patient's arm before closing the incision when inserting a rod to stabilize the fracture. Stalker further stated that the performing of a closed reduction on June 23 with no X-ray from that date (except for the one immediately after the reduction) *416 until August 13, 1970, would fall below the normal standard of care. The recommended procedure when such a closed reduction is performed is to take serial X-rays after the reduction in order to see if the fracture remains stabilized.
After conferring with Dr. Stalker, Mr. Parker researched the law which correctly indicated to him that expert medical testimony is not always required to establish medical malpractice.
Mr. Parker then advised Dr. Sullivan by correspondence of his client's claim. Parker received no answer from Dr. Sullivan, but his correspondence prompted settlement negotiations with representatives of Dr. Sullivan's malpractice insurance carrier. The insurance carrier felt the claim had merit, but could not settle it without Dr. Sullivan's permission, which was refused.
Thereafter, on Mr. Terry's approval, suit was instituted on July 8, 1971. The case was never tried. At Terry's request, it was voluntarily dismissed immediately prior to trial. Dr. Sullivan subsequently filed the present malicious prosecution action.
Obviously, Mr. Parker did not know what Dr. Sullivan's trial testimony would be at the time the malpractice suit was filed, but that testimony confirms the information which was within the knowledge of Mr. Parker and Mr. Terry when suit was instituted. This testimony also bears directly on the overall insufficiency of plaintiff's evidence as presented in the plaintiff's case. See Pickard v. Maritime Holdings Corporation, 161 So.2d 239 (Fla. 3rd DCA 1964).
With respect to inserting the rod into the wrist area, Dr. Sullivan testified on direct examination as follows:
QUESTION: Getting into 1970, and Mr. Terry, did you put the rod in too long?
ANSWER: Yes, I did.
QUESTION: Why?
ANSWER: Because at that point in time there was no X-ray available to take and check the length of that rod, which was my usual practice; ...
* * * * * *
QUESTION: Doctor, is there any reason why you didn't take an X-ray, if you say that that was your usual procedure?
ANSWER: I would have been happy to take an X-ray if the machine was there; I wouldn't be here today.
QUESTION: Why wasn't the machine there?
ANSWER: The hospital "goofed".
QUESTION: How?
ANSWER: They didn't have the machine there; that was their responsibility.
* * * * * *
QUESTION: Is it standard practice to take X-ray?
ANSWER: Yes, it is; it's my practice to take X-ray.
* * * * * *
QUESTION: Did the fact that the rod was an inch too long, did this cause you to bring Mr. Terry back into the hospital for a second procedure to shorten it?
ANSWER: Yes. Again I was faced with a dilemma.
QUESTION: What was the dilemma?
ANSWER: I had to put the rod in too long, because there wasn't X-ray available; so I did what I did and I also was compelled, because of the fact that it was an inch too long, to back it out, because apparently in my judgment it was causing Mr. Terry some difficulty; so I had to back it out.
On cross examination, Dr. Sullivan testified:
QUESTION: And did you select the rod to proper length?
ANSWER: No, I didn't.
QUESTION: Why not?
ANSWER: I was wrong that day.
QUESTION: What do you mean?
ANSWER: Just what I said.
QUESTION: Selected a rod of improper length?
ANSWER: That's correct.
* * * * * *
QUESTION: Was the rod the same length as the ulna in the other arm?
ANSWER: I measured wrong.
* * * * * *

*417 QUESTION: Why do you say you were wrong?
ANSWER: The rod was too long.
QUESTION: Which means that you didn't measure it or you measured it incorrectly.
ANSWER: I measured it incorrectly, obviously.
QUESTION: Is it important 
ANSWER: I wouldn't put it in intentionally too long; that's for sure.
QUESTION: Is it important to the patient that the rod be measured correctly?
ANSWER: Yes; and I'm usually right. I'm very good at my work.
Also on cross examination, Dr. Sullivan testified with respect to the failure of the hospital to provide an X-ray machine in the operating room:
QUESTION: Is there anything in the operative note that says, `Called for X-ray. Not available.'
ANSWER: No, I didn't say that.
QUESTION: Is there anything in the entire hospital record that says that?
ANSWER: No, not that I am aware of.
QUESTION: So, if Mr. Parker read the hospital records, he wouldn't get it from that, would he?
ANSWER: No that's a damaging statement. We try to avoid those things in the record.
Then, with respect to Mr. Terry's damages, Dr. Sullivan testified:
QUESTION: But he had another surgery that he shouldn't have had to have, didn't he?
ANSWER: That's the way it goes in this business.
* * * * * *
QUESTION: Since you feel he should have that reaction, did you charge him for that second admission?
ANSWER: Certainly.
It is interesting to note that Dr. Sullivan solicited contributions from members of the medical profession for instituting this and other malicious prosecution cases. Two of the contributors were Dr. Stalker and Dr. Peacock, an orthopedic surgeon who testified on behalf of the defense. In addition to his expert testimony, Dr. Peacock also testified that if he had known all of the facts in this case he would not have contributed to the prosecution fund.
As previously noted, the primary issue on appeal is whether there was probable cause for bringing the medical malpractice action against Sullivan. As the Florida Supreme Court stated in Goldstein v. Sabella, 88 So.2d 910, 911 (Fla. 1956):
Probable cause is defined as "A reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged." Dunnavant v. State, Fla., 46 So.2d 871, 874. This, as well as other acceptable definitions of the term, indicates that one need not be certain of the outcome of a criminal or civil proceeding to have probable cause for instituting such an action.
Florida courts have not specifically addressed the issue of probable cause in the context of a malicious prosecution action against an attorney by his client's adversary. Nevertheless, we believe that the following statement on the subject from Norton v. Hines, 49 Cal. App.3d 917, 123 Cal. Rptr. 237, 242 (1975), is in accord with general Florida law on the issue of probable cause:

It is the attorney's reasonable and honest belief that his client has a tenable claim that is the attorney's probable cause for representation (citations), and not the attorney's conviction that his client must prevail. The attorney is not an insurer to his client's adversary that his client will win in litigation. Rather, he has a duty "to represent his client zealously . . [seeking] any lawful objective through legally permissible means .. . [in presenting] for adjudication any lawful claim, issue or defense." [A.B.A. Code of Professional Responsibility, EC 7-1, DR 7-101(a)(1), discussed in 1 Witkin, Cal. Procedure (2d ed.) Attorneys, § 239.] So long as the attorney does not abuse that *418 duty by prosecuting a claim which a reasonable lawyer would not regard as tenable or by unreasonably neglecting to investigate the facts and law in making his determination to proceed, his client's adversary has no right to assert malicious prosecution against the attorney if the lawyer's efforts prove unsuccessful. (Emphasis in original).
The existence or lack of probable cause is a pure question of law for the court to determine under the facts and circumstances of a particular case. The resolution of disputed issues of fact is a question to be submitted to the jury. City of Pensacola v. Owens, 369 So.2d 328 (Fla. 1979). In any action for malicious prosecution, the plaintiff is put to the difficult task of proving a negative, i.e., the lack of probable cause. In the instant case, although some facts were in dispute, in looking at the evidence with all conflicts resolved in Dr. Sullivan's favor and in a light most favorable to him, he has not only failed to prove the lack of probable cause, but, in fact, his evidence establishes probable cause for the filing of the medical malpractice action.
Dr. Sullivan now argues that because, after filing it, Mr. Parker did virtually nothing to prepare his suit for trial, that fact alone is indicative of an absence of probable cause. Without condoning this lack of preparation, we find the facts within Mr. Parker's knowledge at the time suit was filed sufficient to constitute probable cause for the commencement of the malpractice action. We hasten to add, however, that we do not pass upon the question of whether there was medical malpractice, only that there was probable cause to believe so, and that Parker conducted a reasonable investigation into the facts prior to filing suit.
In conclusion, we hold Mr. Parker's investigation into the facts surrounding Mr. Terry's complaints developed sufficient information to support a reasonable and honest belief that Terry had a tenable claim against Dr. Sullivan for medical malpractice. The evidence was therefore insufficient to support the plaintiff's claim for malicious prosecution. We reach this conclusion notwithstanding the defendants' failure to move for a directed verdict at the conclusion of all of the evidence, although they did so move at the conclusion of the plaintiff's case and renewed such motions after trial. Generally, a defendant must move for a directed verdict at the conclusion of the plaintiff's case and at the conclusion of all of the evidence to preserve the issue of the sufficiency of the evidence for appellate review. Keyes Co. v. Shea, 372 So.2d 493 (Fla. 4th DCA 1979). However, we find this case falls within the exception to this rule delineated in Pickard, supra, where the court quoted from Baron and Holtzoff, Federal Practice and Procedure, Vol. 2, § 1081:
... The appellate court, therefore, is powerless to review the sufficiency of the evidence to support the verdict if the appellant made no motion for a directed verdict. The only exception is where the insufficiency of the evidence constitutes plain error apparent on the face of the record which if not noticed will result in a manifest miscarriage of justice... .
161 So.2d at 242.
Here, the evidence showed initial, questionable treatment by the performance of a closed reduction of a Monteggia fracture without adequate follow-up X-rays. The closed reduction was unsuccessful, necessitating an open reduction and rod insertion. The doctor admitted he measured the rod incorrectly, and that he was further incorrect in not taking X-rays. He also admitted he deliberately kept these facts out of the hospital records because they were damaging. When later X-rays showed the rod protruding into the wrist, further surgery to shorten it was performed almost six weeks later. This further surgery, necessitated solely by the doctor's admitted prior errors in treatment, was also unsuccessful. Finally, the patient went to another doctor who did still another surgical procedure and corrected all of the prior medical errors. The patient also visited a lawyer who conferred with the latter doctor and with the patient and reviewed records *419 and X-rays. Correspondence to the doctor about the problem resulted in settlement negotiations with the doctor's insurance company.
A manifest miscarriage of justice would occur were we to hold these facts, as proved by plaintiff, supportive of an absence of probable cause to believe the doctor guilty of malpractice. It is not necessary for us to find the doctor was actually guilty of medical malpractice as a matter of law, however, we do find that the evidence proved the existence of, rather than the absence of, probable cause. The case is clearly within the exception where the insufficiency of the evidence constitutes plain error on the face of the record, which, if not noticed, would constitute a manifest miscarriage of justice. Pickard, supra.
Having determined that the evidence was insufficient to support the plaintiff's claim, we find it unnecessary to consider the other points raised on appeal by the appellants, nor is it necessary to consider the cross-appeal. This cause is reversed and remanded with directions to enter a final judgment for the defendants.
BERANEK, J., and WALLACE R. PACK, Associate Judge, concur.