Ellis W. SMITH, Appellee,

v.

ACF INDUSTRIES, INCORPORATED, a corporation, Appellant.

No. 81–2204.

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1982.

Decided Sept. 3, 1982.

Pamela Dawn Tarr, Charleston, W. Va. (Edward W. Rugeley, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., on brief), for appellant.

Menis E. Ketchum, Huntington, Va. (Larry A. Bailey, Greene, Ketchum, Mills, Bailey & Tweel, Huntington, Va., on brief), for appellee.

Before HAYNSWORTH, Senior Circuit Judge, and MURNAGHAN and SPROUSE, Circuit Judges.

HAYNSWORTH, Senior Circuit Judge:

As most workmen's compensation acts, West Virginia's shields an employer from common law tort actions for personal injuries sustained by an employee during the course of his employment. There is an exception, however, if the injury is inflicted with deliberate intention.

In *Mandolidis v. Elkins Industries, Inc.*, 246 S.E.2d 907 (W.Va.1978), the statutory exception was construed to include "willful, wanton or reckless misconduct" causing injury or death.

This is an action in the diversity jurisdiction by an employee against his employer for damages on account of an injury he sustained while at work. He contends that the circumstances bring his case within the *Mandolidis* exception. The district judge submitted the case to a jury which returned a verdict for the plaintiff. On appeal, we conclude that the plaintiff's case does not meet the *Mandolidis* standard and reverse.

I.

The plaintiff was employed as a welder's assistant in the railroad car assembly plant operated by the defendant in Huntington, West Virginia. Some distance from Smith's workplace, there were two large pieces of machinery, a "push-in" and a "rotator" located in close proximity to each other. The rotator is used to tilt railroad cars from side to side, so that welding may be done on all parts of the car. When the rotator is upright, it is a comfortable distance from the three vertical beams of the push-in but when rotated to its extreme positions, horizontal beams of the rotator come within a few inches of the stationary beams of the push-in, thus creating three "pinch points," each as wide as the vertical beams of the push-in.

Normally, only a few maintenance people have occasion to enter the area between the two large pieces of equipment. The rotator itself obstructed the view of its operators of the area between it and the push-in, but when maintenance people had work to do, they would speak to one of the rotator operators, and the rotator would remain stationary until the maintenance mission was accomplished. To warn anyone else who might venture into the area, there was

a system of flashing red lights mounted on the three vertical beams of the push-in, a whistle on the west side of the rotator and a buzzer on the east. These warning devices were activated before rotation began and continued until it was completed. There was testimony that rotation of the chain-driven rotator began with a jerk but that its subsequent progression was not rapid.

On the morning he was injured, Smith had some need for oil. There were several sources of oil in the plant, but the nearest to Smith's workplace was an oil can kept by a millwright at the side of the push-in nearest the rotator. He entered the area between the two large pieces of equipment to get some of the oil. He testified that he knew of the warning lights but admitted that he neglected to look. In any event, as he was leaving the area, a rotating beam of the rotator caught him in the pinch point at one of the vertical beams of the push-in. His collarbone was broken to such an extent that portions of it had to be removed, leaving his lifting power in one arm substantially impaired.

Harris, an electrician and long-time member of the union safety committee and its chairman for the last three years, was responsible for the maintenance of the warning devices. He did not routinely check the warning devices, but if any malfunction was reported to him he would fix it. He testified that there was some trouble with the flashing warning lights because unknown persons sometimes would cut off that system at the circuit breaker. Several days before Smith's injury, it was reported to him that the warning lights were not functioning, and he remedied the situation by closing the circuit breaker. There was some testimony that the visual warning system was malfunctioning on the morning of Smith's injury. According to Harris, one of the red flashing lights had burned out. He replaced it.

One witness who worked on the far side of the push-in testified that the warning lights had not been working for as much as two days before Smith's injury. Oddly, he knew of only one such light, not three. He could not say that he reported the malfunction to any one.

Several witnesses testified that they had been bumped by the rotator. A foreman had had his tin hat knocked off and one witness testified that he had sustained bruises in as many as a dozen encounters with the rotator. In the nine years preceding Smith's injury, during which the condition existed, however, no one in the area between the push-in and the rotator had sustained any injury of any moment, and no one had ever been caught in one of the pinch points.

## II.

▮ Employers who are subject to the West Virginia Workmen's Compensation Act generally are given immunity from tort actions brought by employees for injuries sustained in the workplace. West Virginia Code § 23–2–6. There is a statutory exception, however, when the employee's injury is a result of "the deliberate intention of his employer to produce such injury or death."

▮ The Supreme Court of Appeals of West Virginia has construed the statutory exception to include something more than intentional assaults by an employer. In *Mandolidis v. Elkins Industries, Inc.*, 246 S.E.2d 907 (W.Va.1978), the West Virginia court held that it included death or injury resulting from willful, wanton or reckless misconduct on the part of the employer. It stated that it was using the words willful, wanton and reckless as being synonymous. It emphasized that it was a standard different in kind from negligence, however gross the negligent conduct might be. It was conduct of such a nature that the resulting injury could not be regarded as accidental in any meaningful sense of that word. It was conduct intentionally undertaken by the employer with knowledge that it created a high risk of physical harm to employees. The absence of social utility was also factored into the equation.

*Mandolidis* actually involved three separate cases in which the trial courts had

granted a motion to dismiss or summary judgment for the employer. In two of the cases the allegations were conclusionary. While the court held that those two plaintiffs should be allowed an opportunity to develop their possible proof, the allegations and the depositions before the court in the *Mandolidis* case, itself, shed light upon the court's holding.

Mandolidis was an operator of a table saw in a woodworking plant. He lost two of his fingers and a portion of his hand due to the fact that the saw was unequipped with a safety guard. There was evidence that the employer had removed the safety guards from the table saws for the stated reasons that their presence tended to slow production. Operation of the saw without the safety guard was a violation of both federal and state standards. A federal OSHA inspector had tagged the machines and ordered them out of operation, but the employer removed the tags and continued the operation without the safety guards. There had been previous injuries to other employees from unguarded saws, and a former employee had been discharged for refusing to operate a saw without the guard. Protesting employees were given to understand that a refusal to operate an unguarded saw would result in their being sent home or discharged. When one witness spoke to the plant manager about the plaintiff's injuries due to the absence of a guard, the manager was said to have responded "So what?" "He's getting compensation."

In the *Mandolidis* situation a factfinder might well conclude that the employer knew that injuries would be sustained by saw operators because of the absence of the guards and deliberately chose to require that the saws be operated without guards for the greedy purpose of maximizing production. In that sense, the resulting injuries were deliberately inflicted.

### III.

It is clear that the West Virginia Supreme Court of Appeals did not intend to open its common law courts to every employee suffering injuries because of an unsafe working place or condition created or maintained by a negligent or grossly negligent employer. The *Mandolidis* standard requires substantially more than that.

The proof in this case did not meet those standards. The condition of which the plaintiff complains had been in existence for nine years before Smith suffered his injuries. Other employees had been bumped by the rotator, but their contacts with it were unrelated to the location of the push-in in close proximity to the rotator. The risk that an inattentive employee would be bumped by the rotator was inherent in the rotator's operation, unless it was to have been separately housed, and separate housing would provide no additional protection to employees assigned to work upon it. More importantly, perhaps, those bumpings occasioned no serious or even substantial injury. No one before had ever been caught in one of the pinch points between the vertical beams of the push-in and the horizontal beams of the rotator.

That there was potential danger was recognized by the employer, for it installed visual and audible warning devices which operated when the rotator was in motion. The three flashing red lights, the whistle and the buzzer were all designed to insure that an employee not be indifferent to the movement of the rotator when the employee was near one of the three upright beams of the push-in. That the combined warning system was serving its intended purpose might reasonably have been believed by the employer since the proximity of the two pieces of equipment had never before occasioned any injury. That the employer might have provided better protection for inattentive employees, may tend to prove negligence in some degree, but it does not prove the kind of intentional and unreasonable exposure of employees to great, recognized risk of serious harm, as contemplated by the *Mandolidis* standards.

The defendant's motion for a directed verdict was erroneously denied.

REVERSED.