310 S.E.2d 835

**Tim CLINE, et al.**

v.

**JOY MFG. CO. et al.,
Defendants Below,**

**Jumacris Mining Co. (Two cases).**

**Nos. 15649, 15660.**

Supreme Court of Appeals of
West Virginia.

Sept. 29, 1983.

Dissenting Opinion Dec. 15, 1983.

Rehearing Denied Dec. 15, 1983.

William L. Jacobs, Parkersburg, H. Truman Chafin, Williamson, for Cline et al.

Jackson, Kelly, Holt & O'Farrell, John L. McClaugherty, W.T. Shaffer and A.L. Emch, Charleston, Lawson & Lawson and J. Brooks Lawson, Jr., Williamson, Pamela A. Lambert, Gilbert, for Jumacris Mining Co.

MILLER, Justice:

This case is on cross-appeals from the Circuit Court of Mingo County which granted the defendant's motion for a new trial on damages, but denied its motion to set aside the jury verdict as to liability. The cause of action arises under the deliberate intent exception in the Worker's Compensation Act, W.Va.Code, 23–4–2, which we discussed at some length in *Mandolidis v. Elkins Industries, Inc.*, 161 W.Va. 695, 246 S.E.2d 907 (1978). The plaintiffs, Tim and Bonnie Cline, were awarded damages of four million dollars by the jury. The defendant, Jumacris Mining Company, contends that the evidence was insufficient to support the verdict as a matter of law.[1]

The plaintiff Tim Cline was employed by the defendant at its No. 5 Mine in Mingo County as a section foreman on the second, or evening shift. On March 23, 1977, when the plaintiff was injured, he was the only foreman in the mine. The accident occurred at approximately 10:00 p.m. when the plaintiff was crushed between a rib of coal and the continuous mining machine (hereinafter "continuous miner"), which he was operating by standing outside of it. He had been reaching into the cab to activate the control levers in an attempt to "tram," or move, the continuous miner in a rearward direction. The continuous miner was used to cut coal and load it onto shuttle cars which transported the coal to a dumping point where it was then conveyed by a belt line to the surface.

Earlier in the shift, the regular continuous miner operator, Larry Dale Cline, stopped operating the machine because it had moved forward into an area where water had collected. The water was of sufficient depth to enter the cab. After Larry Dale Cline left the continuous miner, the plaintiff began to operate the machine by standing outside the cab and reaching in to activate the control levers. There is some argument on appeal over whether the plaintiff merely intended to remove the continuous miner from the water in order to protect the machine or whether he proceeded with mining operations. The evidence from the employees present at the scene appears uncontroverted that he did mine some coal. The plaintiff testified that he might have continued mining, but he could not remember.

There is also some controversy over why the plaintiff was attempting to move the machine in a reverse direction. The plaintiff contends that he wanted to get the continuous miner out of the water. The defendant argues that the evidence shows that while the plaintiff continued to mine coal by moving the continuous miner forward, the shuttle car was following the continuous miner and its electrical cable ran out. The cable pulled off the spool, thereby, shutting off electrical power to the shuttle car. According to the defendant's evidence, the plaintiff was standing on the outside of the continuous miner and began to tram it in reverse to shove the shuttle car back to the disconnected cable. We do not believe these factual variances are critical to a resolution of this case.

Whatever the reason for the plaintiff's moving the continuous miner in reverse, it is undisputed that he was pinned between the mine wall and the continuous miner when the left tram lever failed to automatically return to its neutral position once pressure on it was released.

The continuous miner had two sets of control levers inside the operator's cab. One set operated the cutting heads which dug the coal from the seam and conveyed it rearward to be loaded into the shuttle cars. The other set, consisting of two levers positioned immediately in front of the operator's seat, was used to move the continuous

1. The plaintiffs settled with one of the defendants, Joy Manufacturing Company, before the trial commenced. The only defendant, therefore, is Jumacris Mining Company.

miner backward and forward. To tram the machine, a switch inside the operator's cab had to be turned on to get an electric current and a dead man's switch on the deck of the cab as well as the tram levers had to be depressed. Additionally, a cut-off switch, or "panic bar," located in the cab at the shoulder height of a seated operator could stop the machine. Another switch located outside the continuous miner at the left rear could also cut off power.

It also appears that the same left tram lever had been sticking in the reverse position on Friday evening and Monday, prior to the accident Tuesday evening. This malfunctioning had been reported to the mine's management personnel but the lever had not been repaired. However, the lever did work on the shift immediately prior to the accident and there was testimony that sporadic malfunctioning was common, even after the lever had just been repaired. According to the operator of the continuous miner on the day shift, the lever had been repaired a "couple of times" during the week before the accident.

The defendant's primary contention is that had the plaintiff been inside the cab, which had a metal enclosure, he would have been protected against injury. Moreover, if he had been in the cab, he would also have had easier access to various cut-off switches. Several employees testified that the plaintiff would not have been injured had he been inside of the cab, despite the malfunctioning of the tram lever.

The plaintiff maintains that the reason he was outside the cab was that there was water in the cab.[2] The plaintiff testified about an earlier incident when he had been informed by his superior that he could lose his job if he did not protect the continuous miner. Thus, the plaintiff's theory was that he tried to save the machine from the water as previously ordered; that he could only operate it from outside the cab; and, that he had no knowledge the tram lever was broken, but the defendant did know and failed to repair it.

The sole issue in this case is whether there is sufficient evidence to support a finding that the defendant violated the *Mandolidis* standard. We recognize that in view of a favorable jury verdict, the facts must be construed in the light most favorable to the plaintiff. *Wager v. Sine*, 157 W.Va. 391, 201 S.E.2d 260 (1973); *Lambert v. Goodman*, 147 W.Va. 513, 129 S.E.2d 138 (1963). However, we believe there is insufficient evidence to sustain the judgment for the plaintiff.[3]

In *Mandolidis v. Elkins Industries, Inc.*, *supra*, we addressed W.Va.Code, 23–4–2, which permits an injured employee to sue his employer if his injury results from the "deliberate intention" of his employer.[4] We spoke to the question of the meaning of the phrase "deliberate intent" after reviewing a number of our earlier cases,[5] and concluded:

> "In light of the foregoing discussion, the phrase 'deliberate intent to produce such injury or death' must be held to mean that an employer loses immunity from common law actions where such

2. Plaintiff did not testify that he was worried about the possibility of electrocution but some of the employees testified as to this possibility.

3. Because we are reversing the trial court on the issue of liability, we do not address the issue appealed by the plaintiff of whether the trial court erred in awarding a new trial on damages.

4. The relevant portion of W.Va.Code, 23–4–2, is:
"If injury or death result to any employee from the deliberate intention of his employer to produce such injury or death, the employee, the widow, widower, child or dependent of the employee shall have the privilege to take under this chapter, and shall also have cause of action against the employer, as if this chap-

ter had not been enacted, for any excess of damages over the amount received or receivable under this chapter."
In the 1983 Legislative Session, W.Va.Code, 23–4–2, was amended. The above-cited statute was in effect at the time of the plaintiff's injury and so it controls this case. *See Lancaster v. State Comp. Comm'r.*, 125 W.Va. 190, 23 S.E.2d 601 (1942).

5. *E.g., Eisnaugle v. Booth*, 159 W.Va. 779, 226 S.E.2d 259 (1976); *Brewer v. Appalachian Constructors, Inc.*, 135 W.Va. 739, 65 S.E.2d 87 (1951); *Allen v. Raleigh-Wyoming Mining Co.*, 117 W.Va. 631, 186 S.E. 612 (1936); *Maynard v. Island Creek Coal Co.*, 115 W.Va. 249, 175 S.E. 70 (1934); *Collins v. Dravo Contracting Co.*, 114 W.Va. 229, 171 S.E. 757 (1933).

employer's conduct constitutes an intentional tort or wilful, wanton and reckless misconduct. *See Barr v. Curry*, 137 W.Va. 364, 71 S.E.2d 313 (1952); *Stone v. Rudolph*, 127 W.Va. 335, 32 S.E.2d 742 (1944); *see* 2 Restatement (Second) of Torts § 500–03 (1965). While wilful, wanton, and reckless misconduct are well-established concepts, we wish to make clear that we are using the words 'wilful,' 'wanton,' and 'reckless' misconduct synonymously, and that the conduct removing the immunity bar must be undertaken with a knowledge and an appreciation of the high degree of risk of physical harm to another created thereby. *See* Restatement (Second) of Torts § 500, Comment a at 587–88 (1965)." 161 W.Va. at ——, 246 S.E.2d at 914. (Footnotes omitted)

With regard to the term "intentional tort" used in the foregoing quotation, we stated in note 9 of *Mandolidis:*

"We adopt the Restatement Second of Torts definition of 'intent.' Intentional '... denote[s] that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.' Restatement (Second) of Torts § 8A (1965). *See also* W. Prosser, *Handbook of the Law of Torts* 31–2 (4th ed. 1971)." 246 S.E.2d at 914.[6]

Clearly from the foregoing standard, acts amounting to negligence do not meet the *Mandolidis* test. Under *Mandolidis* it is essential, in order for an injured employee to recover, that the employer's misconduct must be of an intentional or wilful, wanton and reckless character, that the employer must have knowledge and appreciation of the high degree of risk of physical harm to another created by such misconduct, and, of course, that the employer's action must be the proximate cause of the injury.

*Mandolidis'* discussion of the statutory "deliberate intent" exception[7] did not substantially depart from our prior case law as evidenced by this statement from *Maynard v. Island Creek Coal Co.*, 115 W.Va. 249, 253, 175 S.E. 70, 72 (1934):

"It may be that the carelessness, indifference and negligence of an employer may be so wanton as to warrant a judicial determination that his ulterior intent was to inflict injury. But in the very nature of things, a showing which would warrant such finding would have to be clear and forceful in high degree."

In *Collins v. Dravo Contracting Co.*, 114 W.Va. 229, 171 S.E. 757 (1933), we concluded that if the facts alleged in the plaintiff's declaration were proved at trial, they would be sufficient to carry the question of deliberate intent to the jury. The plaintiff's decedent was killed when the banks

---

**6.** The reference to Prosser in note 9 of *Mandolidis* is to his well-known definition of a wilful tort:

> "The usual meaning assigned to 'wilful,' 'wanton' or 'reckless,' according to taste as to the word used, is that the actor has *intentionally* done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a *conscious* indifference to the consequences, amounting almost to willingness that they shall follow; and it has been said that this is indispensable." W. Prosser, Handbook of the Law of Torts 185 (4th ed. 1971). (Emphasis added)

The United States Supreme Court has utilized this standard to permit recovery of punitive damages under 42 U.S.C. § 1983 in *Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).

**7.** The Supreme Court of Ohio, in the absence of any statutory right to sue an employer in its

workmen's compensation act, and in the face of a constitutional provision stating that all industrial injuries should be processed under the workmen's compensation act, judicially created an intentional tort exception in *Blankenship v. Cincinnati Milacron Chemicals, Inc.*, 69 Ohio St.2d 608, 433 N.E.2d 572 (1982), *cert. denied*, 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110. Other courts have also created judicial exceptions enabling employees to sue employers for deliberate intent injuries despite their workmen's compensation acts' exclusivity language. *E.g., Breimhorst v. Beckman*, 227 Minn. 409, 35 N.W.2d 719 (1949); *Neal v. Carey Canadian Mines, Ltd.*, 548 F.Supp. 357, 378–79 (E.D.Pa. 1982) (applying Pennsylvania law). Moreover, a number of courts have recognized that intentional torts such as libel, malicious prosecution and false imprisonment committed by an employer fall outside of the exclusive remedy of workmen's compensation. Annot., 46 A.L.R.3d 1279 (1972).

of an excavation in which he was working collapsed and the court gave these facts from the plaintiff's declaration:

" 'The bank where the excavation was being made had broken, all of which the defendant well knew and understood, and the probability of caving in and destroying the life of the plaintiff's decedent was expected and well understood by the said defendant and those engaged in its service and responsible for the construction aforesaid; that many times prior to the caving in of the bank which caused the death of plaintiff's decedent, the said bank had caved in causing great quantities of earth to slide or fall into the place where plaintiff's decedent was ordered to, or required to work; that the danger of the bank again sliding, or the danger of it momentarily sliding or caving in was so apparent that the said defendant, at all times, had notice and was charged with notice that the place where plaintiff's decedent was required to work was nothing more or less than a death-trap.' " 114 W.Va. at 231, 171 S.E. at 757.

Of some interest are several federal court cases which have dealt with the *Mandolidis* standard. In *Smith v. ACF Industries, Inc.,* 687 F.2d 40 (4th Cir.1982), the plaintiff was rather severely injured when he was caught between two pieces of machinery at his place of employment. One of the machines, when it was fully extended, would result in its horizontal beams coming within a few inches of the other machine creating what was termed a "pinch point." When not so extended, there was ample space to walk between the two machines.

There were warning lights and a buzzer installed on the machine which would be automatically activated when the machine began to move to its extended position. There was some testimony that at the time that the plaintiff was injured, the warning lights may not have been working. Plaintiff's further contention was that the area constituted a dangerous condition and the employer had not supplied adequate protective devices. The court utilizing our *Mandolidis* standard held that the evidence was not sufficient to meet the deliberate intent standard.

The federal district court has applied the *Mandolidis* standard in *Littlejohn v. ACF Industries,* 556 F.Supp. 70 (S.D.W.Va. 1982), and set aside a jury verdict in favor of the plaintiff. The injury occurred while the plaintiff was working as a brakeman and had his hand crushed when he attempted to open a coupling on a stationary railroad car. The engineer was backing a string of five cars toward the stationary car and was in radio communication with the plaintiff.

Two claims were advanced to support wilful misconduct based on what plaintiff asserted were dangerous work practices of the defendant. The first was that the defendant sanctioned the opening and closing of couplers by hand. The second claim related to the use of the radio transmission unit that was operated by the plaintiff. The defendant had no procedure that required the plaintiff to obtain an acknowledgement from the person to whom he transmitted his message that it had been received. The plaintiff had transmitted a message to the engineer to stop the train before he undertook the coupling procedure but the engineer did not receive the message. The district court concluded that neither of these claims demonstrated wilful misconduct under the *Mandolidis* standard.

■ There are several critical and undisputed facts in this case. The plaintiff was in charge of the work force and had the immediate responsibility for the control of the operations in the involved section. There was no evidence that any other supervisory personnel had issued any orders with regard to the mining operation on that shift prior to the accident. After the regular continuous miner operator stopped the equipment because it had gotten into water, the plaintiff proceeded to operate the continuous miner in a forward direction cutting and loading coal. This direction of operation was further into and not away from the water. Although there were pumps available to remove the water, they

were not utilized. Finally, there was no evidence that the water on the mine floor presented a danger to the continuous miner.

The plaintiff's theory, broken into its sequential steps, fails to implicate the employer for intentional, wilful or wanton misconduct. With the regular operator off the continuous miner, it could have been left until the water was pumped out. No representative of the employer other than the plaintiff was ever advised of this condition and as a consequence no order was ever issued that would have exposed anyone to a substantial risk of physical injury.

Although the plaintiff argues that in a conversation with one of his supervisors some days before the accident he was advised to protect the machine or he could lose his job, we do not find that the continuous miner was in any danger. Moreover, this general admonition to protect the equipment falls far short of the direct order to work in the face of a known dangerous condition that was one of the hallmark facts in *Mandolidis*.[8] We, therefore, conclude that under the facts of this case, the plaintiff failed to meet the *Mandolidis* requirements.

■ The defendant seeks to have us enter what amounts to a judgment notwithstanding the verdict. This we are not able to do as the defendant failed to preserve his motion for a directed verdict at the trial level. The record reflects that the defendant moved for a directed verdict at the close of the plaintiff's case but failed to renew his motion at the close of all of the evidence. Consequently, we are controlled by Syllabus Point 1 of *Chambers v. Smith*, 157 W.Va. 77, 198 S.E.2d 806 (1973):

"Although Rule 50(a) of the West Virginia Rules of Civil Procedure expressly provides that a party may introduce evidence upon the refusal of his motion for a directed verdict made at the close of his opponent's case, introduction of evidence at that point of the trial constitutes a waiver of the objection to the sufficiency of the evidence unless the motion for a directed verdict is renewed after all the evidence is in and the parties have rested."

As *Chambers* recognized, our rule is parallel to the federal rule. *De Marines v. KLM Royal Dutch Airlines*, 580 F.2d 1193 (3d Cir.1978); *Lowenstein v. Pepsi-Cola Bottling Co.*, 536 F.2d 9 (3d Cir.1976), *cert. denied*, 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334; *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572 (7th Cir.1976); *Moran v. Raymond Corp.*, 484 F.2d 1008 (7th Cir.1973), *cert. denied*, 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974); 5A Moore's Federal Practice § 50.05 (1977).

■ However, the defendant in his motion for a new trial did assign as a ground that "the evidence was insufficient to support the verdict." While the trial court overruled the motion for a new trial, we are not foreclosed from reviewing this issue under Syllabus Point 4 of *Sanders v. Georgia-Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976):

"Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence."

*See also Kesner v. Trenton*, 158 W.Va. 997, 216 S.E.2d 880 (1975); *Young v. Duffield*, 152 W.Va. 283, 162 S.E.2d 285 (1968);

---

**8.** The facts in *Mandolidis* were that he operated a machine powered table saw and lost part of his hand. The saw was originally equipped with a safety shield by its manufacturer. However, the employer removed the shield because it slowed production. The operation of the machine without the shield violated both state and federal regulations. A federal safety inspector had ordered that the machine not be used until the safety shield was replaced and tagged the machine. The employer removed the tags and continued operating it without the shield. There had been previous injuries on the machine because of the lack of the shield. An employee had been fired when he refused to operate the machine without the safety shield. Mandolidis protested the unsafe condition and was given to understand that if he did not operate it he would be fired.

*Ruffner's Heirs v. Hill,* 31 W.Va. 428, 7 S.E. 13 (1888).

■ We conclude that the trial court erred in not granting the defendant's motion for a new trial as the evidence presented failed as a matter of law to show a deliberate intention on the part of the employer to cause injury to the plaintiff. Therefore, we reverse the judgment of the trial court and remand the case.

Reversed and Remanded.

McGRAW, Chief Justice, dissenting:

Tim Cline was a section boss at the defendant's No. 5 Mine in Mingo County when he was tragically crushed between a rib of coal and the continuous mining machine he was operating. In the coal mines, a section boss is a first line supervisor. In reality, he is a man with no place to go. He is squarely situated in the middle of the traditional coal field tension between management and labor. Not only is he responsible for maintaining production, he must sometimes become involved in production itself. Due to his precarious position in the managerial hierarchy, a section boss is the first man to be thrown off the boat when its steerage becomes labored. He has no job tenure and no job protection. Tim Cline was in this position. Therefore, because management threatened to fire him if he did not protect the continuous miner, which was critical to the maintenance of production, Tim Cline acted to protect both the company's machine and his own job.

Merely because Cline was a boss, and not protected by the benefits of a collective bargaining agreement, does not mean he is not entitled to the full benefit of the protections furnished by rules of law extant in civil and appellate procedure. As the majority correctly notes, the defendant in this case failed to renew its motion for a directed verdict at the close of all the evidence. The direct result of that failure, as the majority recognizes, is that the defendant thereby waived any "objection to the sufficiency of the evidence ...." Syl. pt. 1, *Chambers v. Smith,* 157 W.Va. 77, 198 S.E.2d 806, 809 (1973). This rule is not only parallel to the federal rule, as the majority indicates, but it is also by far the rule in the majority of jurisdictions. *See Grindstaff v. Tygett,* 655 S.W.2d 70 (Mo. App.1983); *International Fidelity Ins. Co. v. Wilson,* 387 Mass. 841, 443 N.E.2d 1308 (1983); *Schmidt v. Pine Tree Land Development Co.,* 291 Or. 462, 631 P.2d 1373 (1981); *Daniel v. Quick,* 270 Ark. 528, 606 S.W.2d 81 (App.1980); *Frisella v. Reserve Life Ins. Co.,* 583 S.W.2d 728 (Mo.App. 1979); *Drouillard v. Jensen Const. Co. of Oklahoma, Inc.,* 601 P.2d 92 (Okl.1979); *Pearson v. Adams,* 279 N.W.2d 674 (S.D. 1979); *Woods v. Harrell,* 596 S.W.2d 92 (Tenn.App.1979); *Hill-Martin Corp. v. Alling,* 137 Vt. 432, 407 A.2d 168 (1979); *Murphy v. Frinkman,* 92 N.M. 428, 589 P.2d 212 (1978); *R.J. Frank Realty, Inc. v. Heuvel,* 284 Or. 301, 586 P.2d 1123 (1978); *Terrio v. Millinocket Community Hospital,* 379 A.2d 135 (Me.1977); *Barber v. Citizens and Southern Nat. Bank,* 268 S.C. 16, 231 S.E.2d 295 (1977); *Hauser v. Calawa,* 116 N.H. 676, 366 A.2d 489 (1976); *Johnson v. McAllister,* 455 S.W.2d 563 (Ky.1970); *Schofield v. Uebel,* 254 Md. 402, 254 A.2d 655 (1969); *Christensen v. Stuchlik,* 91 Idaho 504, 427 P.2d 278 (1967).

The policies underlying this rule are well established. In *Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 297 (5th Cir.1978), the Fifth Circuit identified the primary reason for the rule: "The policy underlying this rule is sound: a party is not permitted to gamble on the verdict and later question the sufficiency of the evidence that led to his defeat." Additionally, as the court stated in *Little v. Bankers Life and Casualty Co.,* 426 F.2d 509, 511 (5th Cir.1970), "the litigant who has not moved for a directed verdict in the trial court must have been of the view that the evidence made a case for the jury; he should not be permitted on appeal to impute error to the trial judge for sharing that view." Therefore, "courts have adhered to the longstanding rule that the introduction of evidence [after making an unsuccessful motion for directed verdict at the close of his opponent's case] constitutes a waiver of the objection to the sufficiency of the evidence unless the motion is renewed at the time when all the evidence

is in." 5A Moore's Federal Practice § 50.05 (1977) (footnotes omitted).

The majority, while paying lip service to this well established rule of law, attempts to sidestep its application by apparently holding that waiver does not extend to motions for a new trial based upon insufficiency of the evidence. This attempt to avoid the waiver rule conflicts with its general application throughout the country.

In *Scheib v. Williams-McWilliams Co., Inc.*, 628 F.2d 509, 512 (5th Cir.1980), the court stated the generally accepted rule,

> When, as in this case, a motion for a new trial has been made on the ground of insufficient evidence to support the verdict and the like, the failure by the losing party to move for a directed verdict ... still operates to foreclose consideration of the question of sufficiency on appeal, and the appellate court may inquire only whether the trial court abused its discretion in overruling the motion for a new trial.

*Quoting, Little, supra* at 511, *citing, Brown v. Burr-Brown Research Corp.*, 378 F.2d 822, 824 (5th Cir.1967); *Pruett v. Marshall*, 283 F.2d 436, 438 (5th Cir.1960); *see also Valm v. Hercules Fish Products, Inc.*, 701 F.2d 235 (1st Cir.1983); *TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542 (6th Cir.1981); *LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico*, 536 F.2d 443 (1st Cir.1976); *Berman v. Palatine Ins. Co.*, 379 F.2d 371 (7th Cir. 1967); *Southern Railway Co. v. Miller*, 285 F.2d 202 (6th Cir.1960); *Oslund v. State Farm Mutual Automobile Ins. Co.*, 242 F.2d 813 (9th Cir.1957); *Home Ins. Co. v. Davila*, 212 F.2d 731 (1st Cir.1954); *Irvin Jacobs & Co. v. Fidelity & Deposit Co.*, 202 F.2d 794 (7th Cir.1953); *Atlantic Coast Line R. Co. v. Smith*, 135 F.2d 40, 41 (5th Cir.1943); *Woodbridge v. DuPont*, 133 F.2d 904 (2d Cir.1943); *Fallert Tool & Engineering Co., Inc. v. McClain*, 579 S.W.2d 751 (Mo.App.1979); *Eva-Lee, Inc. v. Thomson General Corp.*, 5 Mass.App. 823, 362 N.E.2d 935 (1977); *Drouillard v. Jensen Construction Co. of Oklahoma, Inc., supra; Fales v. Kaupp*, 83 S.D. 487, 161 N.W.2d 855 (1968); *Bredouw v. Jones*, 431 P.2d 413 (Okl.1966); *Galbraith v. Oswald*, 237 Md. 620, 205 A.2d 797 (1965); *Clagett v. Neugebauer*, 376 S.W.2d 768 (Tex.Civ. App.1964); *but see Vieau v. City and County of Honolulu*, 653 P.2d 1161 (Hawaii App.1982).

The court in *Scheib*, 628 F.2d at 512, identified the issue on appeal of a denial of a motion for a new trial based upon insufficiency of the evidence where the appellant fails to renew his motion for a directed verdict as "whether there was an 'absolute absence of evidence to support the jury's verdict.' *Fugitt v. Jones*, 549 F.2d 1001 at 1004 (5th Cir.1977); *Litherland v. Petrolane Offshore Construction Services, Inc.*, 546 F.2d 129, 134 (5th Cir.1977); *Urti v. Transport Commercial Corp.*, 479 F.2d 766, 769 (5th Cir.1973); *Indamer Corp. v. Crandon*, 217 F.2d 391, 393 (5th Cir.1954)." Similarly, other courts have adopted severely stringent tests for reviewing the sufficiency of the evidence upon appellant's failure to renew his motion for a directed verdict. In *Dunn v. Sears, Roebuck & Co.*, 639 F.2d 1171, 1175 (5th Cir.1981), the court stated, "Our inquiry is ... 'limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a 'manifest miscarriage of justice.' *Coughlin v. Capitol Cement Co.*, 571 F.2d at 297; *Little v. Bankers Life & Casualty Co.*, 426 F.2d 509, 511 (5th Cir.1970)." In *Valm*, 701 F.2d at 237, the court stated, "In order to award a new trial in this case, we must find that the jury's verdict was so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice." *Quoting Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 200 (1st Cir.1980). Several state courts also apply a "manifest injustice" or "miscarriage of justice" test in such cases. *See Avery v. Gilliam*, 97 Nev. 181, 625 P.2d 1166 (1981); *Fee, Parker & Lloyd, P.A. v. Sullivan*, 379 So.2d 412 (Fla.App.1980); *Henderson v. Meyer*, 533 P.2d 290 (Utah 1975).

The only "miscarriage of justice" in the present case is the majority's failure to afford Cline the appropriate standard of review. Under the "any evidence" test,

Cline clearly presented sufficient evidence to allow the case to go to the jury, and to support its subsequent verdict. His employer's conduct in threatening his job unless he protected the continuous miner created a situation whereby Cline was forced to obliterate his concerns about his own personal safety in favor of the safety of his employer's machine, which his employer knew was malfunctioning and in need of repair. By ignoring the correct standard of review, the majority substitutes its interpretation of the facts, based upon a cold record, for that of both the trial court and the jury. Moreover, a curious result of this disregard for the waiver rule is that the majority is forced to remand a case for retrial which it has already determined fails to state a cause of action upon which relief may be granted. Yet, the majority clearly holds that Cline is entitled to a new trial, and a new trial he must have. Accordingly, for the foregoing reasons, I will not condone this travesty of justice.

I am authorized to say that Justice HARSHBARGER joins in this dissent.